**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

THE ESTATE OF KYLE CHRISTOPHER  YOEMANS,
by and through its putative personal representative Aimee Ishmael,
AIMEE ISHMAEL, individually,

       Plaintiffs,

v.

WELLPATH, LLC, F/K/A CORRECT CARE SOLUTIONS, LLC,
JANICE MARSHALL, in her individual capacity,
CHRISTOPHER CAMPBELL, in his individual capacity,
DENNIS AYALA, in his individual capacity,
GARY BROWN, in his individual capacity,
DANIEL GILBERT, in his individual capacity,
ROSS YNIGUEZ, in his individual capacity,
JOSEPH FISHER, in his individual capacity,
MICHAEL MCINTOSH, in his individual capacity,
RICHARD REIGENBORN, in his official capacity as Sheriff of Adams County,
BOARD OF COUNTY COMMISSIONERS OF COUNTY OF ADAMS, COLORADO,

       Defendants.

---

## COMPLAINT AND JURY DEMAND

---

       Plaintiffs the Estate of Kyle Christopher Yoemans and Aimee Ishmael, by and through

counsel of the law firm Haddon, Morgan and Foreman, P.C., submit the following Complaint

and Jury Demand:

## I.      INTRODUCTION

       1.      On February 8, 2017, Kyle Christopher Yoemans lost his life at age 26, and

Aimee Ishmael lost her only son. This senseless death was easily preventable. Mr. Yoemans, a

pretrial detainee in the Adams County Detention Facility ("ACDF" or "jail") was murdered by

an erratically homicidal man, Che Bachicha. The Defendants knew Mr. Bachicha presented

extreme dangers to others, including Mr. Yoemans, but inexplicably housed him in general population, allowing Mr. Bachicha to murder Mr. Yoemans.

2.      Had the Defendants housed Mr. Bachicha in a medical or mental health unit, Mr. Yoemans would still be alive. If the Defendants had closely supervised Mr. Bachicha, Mr. Yoemans would still be alive. If the Defendants had done *anything* other than lock Mr. Yoemans—who was helpless to protect himself—in a cell overnight with Mr. Bachicha, Mr. Yoemans would still be alive. The Defendants' decisions failed to protect Mr. Yoemans and led directly to his horrific, painful death.

3.      If anyone merited separation from others and close supervision and treatment, it was Mr. Bachicha. The Defendants knew Mr. Bachicha was psychotic, erratic and volatile. The reason for Mr. Bachicha's detention was his attempt to kill his step-father in the family home by stabbing him multiple times in the neck with a prison-style shank. The Defendants were intimately familiar with Mr. Bachicha's history of serious mental illness and violence because he previously attacked inmates while being detained in the ACDF. Mr. Bachicha had been convicted of strangulation assault—*the same way he'd kill Mr. Yoemans*. He was unmedicated and plainly unstable.

4.      Mr. Bachicha's family warned the jail that he was violently unstable and should be separated. Mr. Bachicha himself reportedly asked to be placed in the medical unit, knowing he was unwell and uncontrollably violent. And as allegations below make clear, the Defendants knew Mr. Bachicha posed an extreme danger to others. Indifferent to the consequences, they placed Mr. Bachicha in general population, where they knowingly failed to supervise him in extremely dangerous conditions.

2

5.      The hands of Mr. Bachicha may have killed him, but Mr. Yoemans' death is the fault of the individual and systemic failures of these Defendants. As tragically alleged herein, the County and the Sheriff had known for years that the jail was dangerously understaffed and unsafe, faced a crisis of mental illness, and dangerously failed to screen, classify, house, and treat seriously mentally ill inmates like Mr. Bachicha. These Defendants indifferently chose not to take adequate steps to protect pretrial detainees like Mr. Yoemans.

6.      The Defendants deprived Mr. Yoemans of his rights under the United States Constitution through knowing and deliberate indifference to excessive risks of serious harm and death to Mr. Yoemans. This is a civil action for declaratory, equitable, and damages relief, pursuant to 42 U.S.C. § 1983 for Defendants' violation of Mr. Yoemans' rights under the Fourteenth Amendment to the United States Constitution.

7.      Plaintiff Aimee Ishmael, Kyle's mother, also brings suit for wrongful death against Defendant Wellpath and its employee Defendant Janice Marshall, for recklessly and negligently failing to properly screen Mr. Bachicha for mental illness or recommend a safe housing placement.

## II.      JURISDICTION AND VENUE

8.      This action arises under the Constitution and laws of the United States and the State of Colorado, and pursuant to Title 42 U.S.C. § 1983 and the Colorado Wrongful Death Act.

9.      Jurisdiction is conferred on this Court pursuant to 28 U.S.C. §§ 1331, 1343, and 2201.

10.     Supplemental jurisdiction over the state claims is conferred by 28 U.S.C. § 1367 because the violations of federal law alleged are substantial and meritorious and the state causes of action arise from a common nucleus of operative facts.

11.     Jurisdiction supporting attorney fees and costs is conferred by 42 U.S.C. § 1988.

12.     Personal jurisdiction over each of the defendants is conferred under Federal Rule of Civil Procedure 4(d)(1).

13.     Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b). All of the events alleged herein occurred within the State of Colorado, and on information and belief all of the parties were residents of the State at the time of the events giving rise to this litigation.

### III.     PARTIES

14.     Plaintiff the Estate of Kyle Christopher Yoemans (the "Estate") is a party in interest following the death of Kyle Christopher Yoemans, a citizen of the United States, who died in the Adams County Detention Facility in the custody of the Adams County Sheriff's Office ("ACSO"). The Estate appears through its putative personal representative, Aimee Ishmael, the mother of Mr. Yoemans.

15.     At all times relevant to this Complaint, Plaintiff Aimee Ishmael was a citizen of the United States, a resident of the State of Colorado, and the mother of Kyle Christopher Yoemans. Mr. Yoemans died without a spouse or any children.

16.     Defendant Wellpath, LLC, ("Wellpath") is the corporation formerly known as Correct Care Solutions, LLC ("CCS"), which was the corporation that employed Defendant Marshall and who contracted with the County for services as described herein. CCS merged with

4

another company and recently renamed itself Wellpath, LLC.[1] Defendant Wellpath f/k/a Correct

Care Solutions, LLC, is a Tennessee corporation doing business in Colorado, with its principal

street address at 1283 Murfreesboro Road, Suite 500, Nashville, TN, 37217. Its registered agent

of service in Colorado is located at 155 E. Boardwalk #490, Fort Collins, CO 80525. Defendant

Wellpath may properly be sued under 42 U.S.C. § 1983 for its deliberately indifferent policies,

practices, habits, customs, procedures, decision-making, training, and supervision of staff.

17.     At all times relevant to this Complaint, Defendant Janice Marshall was a citizen

of the United States, a resident of the State of Colorado, and was acting under color of state law

as a nurse employed by Defendant Wellpath.

18.     Defendants Wellpath and Marshall are referred to collectively as the "Wellpath

Defendants."

19.     At all times relevant to this Complaint, Defendant Christopher Campbell was a

citizen of the United States, a resident of the State of Colorado, and was acting under color of

state law in his capacity as a Court Services Specialist for the Adams County Sheriff's Office

("ACSO").

20.     At all times relevant to this Complaint, Defendant Dennis Ayala was a citizen of

the United States, a resident of the State of Colorado, and was acting under color of state law in

his capacity as a deputy for ACSO.

21.     At all times relevant to this Complaint, Defendant Gary Brown was a citizen of

the United States, a resident of the State of Colorado, and was acting under color of state law in

his capacity as a deputy for ACSO.

---

[1] Wellpath will be referred to as CCS in this Complaint.

5

22.     At all times relevant to this Complaint, Defendant Daniel Gilbert was a citizen of the United States, a resident of the State of Colorado, and was acting under color of state law in his capacity as a deputy for ACSO.

23.     At all times relevant to this Complaint, Defendant Ross Yniguez was a citizen of the United States, a resident of the State of Colorado, and was acting under color of state law in his capacity as a deputy for ACSO.

24.     At all times relevant to this Complaint, Defendant Joseph Fisher was a citizen of the United States, a resident of the State of Colorado, and was acting under color of state law in his capacity as a Detention Specialist for ACSO.

25.     At all times relevant to this Complaint, Defendant Michael McIntosh was a citizen of the United States, a resident of the State of Colorado, and was acting under color of state law in his capacity as the Sheriff for ACSO. He is sued in his individual capacity.

26.     Defendant Richard Reigenborn is the current Sheriff of Adams County, and is a policy-maker and final decision-maker for the County. He is sued in his official capacity.

27.     Defendant the Board of County Commissioners of Adams County, Colorado ("Adams County" or the "County"), is a governmental entity charged under the laws of Colorado, and is a policy-maker and final decision-maker for the County. Defendant Adams County funds, oversees, and sets policy for the ACSO, ACDF, and the County. Adams County operates ACDF, the jail at issue herein, located at 150 N. 19th Avenue, Brighton, Colorado, 80601. Defendant Adams County also contracted with CCS, now Defendant Wellpath, in 2016 to provide services including mental health screening and housing placement screening, among

other services, for pretrial detainees and inmates in ACDF. Defendant Adams County is a proper defendant to this action pursuant to C.R.S. § 30-11-105.[2]

28.     Defendants Sheriff Reigenborn and the Board of County Commissioners are referred to collectively as the "Adams County Defendants" and "Adams County."

## IV.     FACTUAL ALLEGATIONS

### Background

29.     At the time of his death, the County held Mr. Yoemans in its care as a pretrial detainee awaiting trial. He had not been convicted of any crime. He was presumed innocent and protected by the Fourteenth Amendment's due process clause, and he had a right to be safe while in Defendants' custody.

30.     On June 6, 2016, Mr. Yoemans suffered a major motorcycle accident. He was hospitalized for serious physical and traumatic brain injuries, and on that date also taken into custody relating to an alleged incident before the crash. Mr. Yoemans remained hospitalized for months due to the severity of his injuries, until about September 23, 2016, when he was transferred to the Adams County jail and initially housed in the infirmary. Because of his legal incompetence resulting from his brain injuries Mr. Yoemans was transferred to Colorado Mental Health Institute ("CMHI") in Pueblo on December 15, 2016. He returned to the ACDF on January 30, 2017, and he was housed in cell B-231 with Che Bachicha. A week later Mr. Yoemans was dead.

---

[2] As used herein, the term "inmate" refers to both pretrial detainees and people convicted and serving sentences in the jail, because these individuals intermingle in the facility. However, at all times relevant, Mr. Yoemans was a pretrial detainee.

31.     The evening of his death, February 7, 2017, at about 10:00 p.m., Mr. Yoemans was locked down in cell B-231 alone with Mr. Bachicha. Around or just after midnight, Mr. Bachicha attacked Mr. Yoemans without provocation, bashing him about the head and body, and ultimately strangling him to death. This uninterrupted attack went on, and unnoticed, for at least 10-15 minutes.

32.     Each of the Defendants knew they had a duty to provide a "safe and humane environment for persons incarcerated" in the jail, including pretrial detainees like Mr. Yoemans.

33.     As detailed below, the Defendants made a series of decisions resulting in Mr. Yoemans' death. Defendants, individually and collectively knew that Mr. Bachicha suffered from severe mental illness, that he was inadequately medicated, that he was extremely dangerous and violent, that he previously attacked inmates in the ACDF, and that he posed an excessive and substantial risk to other detainees, including Mr. Yoemans. Despite this knowledge, the Defendants placed Mr. Bachicha in general population, failed to adequately supervise or monitor him, and failed to protect Mr. Yoemans.

**Warnings and Requests for Separate Mental Health Placement by Bachicha's Family**

34.     Warning alarms sounded from the outset, including warnings from Mr. Bachicha's own family, deeply concerned both for his well-being and the safety of those around him. On January 22, 2017, Mr. Bachicha attempted to murder his step-father without provocation, stabbing him multiple times in the neck with a prison-style "shank" in an obviously psychotic and delusional state.

35.     When law enforcement arrested Mr. Bachicha his mother reported to law enforcement that her son suffered from severe and long-standing mental illness including bipolar

8

disorder, that he had been paranoid and delusional, and that he had not been taking prescribed medications for several months. She reported that Mr. Bachicha had been incarcerated the majority of his adult life, which had further traumatized him and caused PTSD. Mr. Bachicha's family informed law enforcement he reported seeing "demons" and disturbing hallucinations.

36.     Mr. Bachicha's mother begged officers to have the jail place Mr. Bachicha in the mental health ward and separated from others. These officers knew this was necessary from their own observations of Mr. Bachicha. Upon information and belief, officers provided this information to ACDF staff when delivering Mr. Bachicha to the jail, consistent with their duties and with law enforcement practices.

37.     Mr. Bachicha's mother again sounded the alarm and warned the jail directly. After Mr. Bachicha was arrested on January 22 and before he killed Mr. Yoemans, his mother called the jail expecting Mr. Bachicha to be in a mental health ward and separated, as she'd urged. To her great concern, jail staff informed her that the mental health ward was being "refurbished" and was not available. Thus, Mr. Bachicha was in general population. Shocked, Mr. Bachicha's mother again admonished the ACDF that her son suffered from severe mental illness, had not been medicated for months, was paranoid and psychotic, obviously homicidal, needed to be placed in a mental health ward and separated from others. The jail failed to act on the information. These warnings ignored, days later Mr. Bachicha killed Mr. Yoemans.

**Defendant Marshall's Deliberate Indifference, Recklessness, and Negligence**

38.     The evening of January 22, 2017, the same day Mr. Bachicha nearly killed his step-father in a psychotic homicidal state, he was screened for mental health and housing placement by Defendant Janice Marshall, a nurse employed by Defendant Wellpath. Defendant

Marshall was responsible for screening Che Bachicha for mental illness, and dangerousness to self and others, upon his intake into the jail. These responsibilities included a duty to assess Mr. Bachicha observationally, interview him, consider information provided by officers and deputies, and review Mr. Bachicha's file.

39.     On information and belief, Defendant Marshall was aware of Mr. Bachicha's family reporting earlier that same day he was psychotically ill, and that he should be placed in the mental health ward. Regardless, Defendant Marshall knew from her interactions with Mr. Bachicha, reviewing Mr. Bachicha's file, and from the homicidal act Mr. Bachicha had just committed, that Mr. Bachicha had severe mental illnesses, wasn't properly medicated, and was plainly a danger to himself and others. Defendant Marshall also knew from Mr. Bachicha's file that he'd previously been violent in the jail, had prior violent convictions, and had previously been diagnosed and treated with medication for severe mental illness in the ACDF in the past.

40.     Defendant Marshall also knew that even if Mr. Bachicha began taking medication right await would take months of close evaluation and monitoring to assess whether he had stabilized, whether his homicidal delusions would abate or not, and when—if ever—it would become safe to house him with others. Defendant Marshall knew that medicating Mr. Bachicha could initially even make him *more* dangerous or cause an adverse reaction, so that even if treatment began separation from others and close, direct supervision would be necessary to reasonably assure safety. Defendant Marshall knew that Mr. Bachicha posed an excessive risk to other detainees' health and safety, and was deliberately indifferent to this risk.

41.     Defendant Marshall had a duty to flag Mr. Bachicha's mental illness and recommend a housing placement that would ensure the well-being of Mr. Bachicha and the

10

safety of pretrial detainees including Mr. Yoemans. She knowingly, recklessly and negligently failed to meet this duty.

42.     In screening Mr. Bachicha on January 22, 2017, Defendant Marshall completed the Receiving Screening form, which allowed for a number of housing placement options. She chose "general population," with knowing and deliberate indifference to the extreme danger to others, including detainees like Mr. Yoemans, that would follow. She made this choice despite other options available to her on the form, and failed to recommend that Mr. Bachicha be placed in the infirmary, "observational housing", "isolation", "mental health lockdown", emergency "evaluation/treatment", or any other option separating him from others.

43.     At a minimum, Defendant Marshall knew she should recommend the infirmary or medical unit and bring the situation to the attention of jail supervisors, ensuring Mr. Bachicha would be safely housed and closely observed and evaluated for the safety of everyone. Instead, Defendant Marshall checked the box for "general population" which she knew would result in Mr. Bachicha being housed with a cellmate, locked down with that cellmate overnight, without adequate supervision and monitoring, and that the cellmate would be someone like Mr. Yoemans. Defendant Marshall knew it was extremely dangerous to house severely mentally ill detainees like Mr. Bachicha, with those who did not suffer from severe mental illness in general population.

44.     Defendant Marshall was deliberately indifferent to a known, obvious, and excessive risk to the health and safety of Mr. Yoemans and other pretrial detainees in general population, exposing them to serious harm and death. Any objectively reasonable nurse or

mental health screener would know that her actions and inaction were extremely dangerous, reckless, and would constitute deliberate indifference to the health and safety of other detainees.

45.     Defendant Marshall also recklessly and negligently screened Mr. Bachicha and recommended general population despite the safer alternatives, and violated the appropriate standard of care.

### Defendant Campbell's and Ayala's Deliberate Indifference

46.     Defendants Campbell and Ayala are referred to herein as the "Classification Defendants" because they were responsible for classifying and selecting the cell in which Mr. Bachicha was placed in general population.

47.     After Defendant Marshall approved Mr. Bachicha for "general population" on January 22, 2017, he remained in the jail's booking process for two more days. On January 24, 2017, Defendant Campbell reviewed Mr. Bachicha's file and made another decision on his housing placement. As a Court Services Specialist and employee of the County, Defendant Campbell's duties required him to classify Mr. Bachicha to a housing assignment that would protect the safety of other detainees, including Mr. Yoemans. He completed a Classification Assessment form for Mr. Bachicha documenting his knowledge and decisions.

48.     In making his decision, Defendant Campbell had complete access to Mr. Bachicha's lengthy jail file. The file documented that Mr. Bachicha had multiple prior convictions in Adams County, multiple stints in the jail, had previously been treated and medicated for serious mental illness in the jail, and had multiple violent disciplinary and other management issues in the jail. Defendant Campbell reviewed Mr. Bachicha's file and was  aware of its contents.

12

49.     Defendant Campbell knew he had the duty to disregard and override Defendant Marshall's suggestion of "general population" under the circumstances as stated herein. He could not, and did not, delegate his duty to ensure a safe classification assessment to Defendant Marshall. He had an independent duty to recommend a safe housing placement, and failed to meet it.

50.     As he read Mr. Bachicha's file, sirens rang in Defendant Campbell's mind, because his own written notations on the Classification Assessment admit he knew Mr. Bachicha posed grave dangers. From reviewing the file, Defendant Campbell knew that Mr. Bachicha had multiple violent convictions ***including assaulting and seriously injuring another inmate in Adams County jail***; he knew Mr. Bachicha was severely mentally ill and had been diagnosed and treated with medication in the jail during prior jail stints; he knew Mr. Bachicha was then unmedicated and inadequately medicated, and would be for the indefinite future, because he had not been taking his medication for months and was clearly in a homicidal state; he knew Mr. Bachicha was experiencing paranoia and psychosis causing erratic and homicidal conduct, as evidenced in his stabbing attempted murder.

51.     Specifically, in Mr. Bachicha's jail file Defendant Campbell read records informing him of warning signs including, but not limited to, the following:

a.      **Bachicha's Prior Strangulation Assault:**  In 2011 in Adams County, Mr. Bachicha faced assault and false imprisonment charges, resulting in a conviction. Mr. Bachicha put the victim in a "chokehold", struck her, and "used both hands to choke her until she went weak and could not remember what happened," and she thought he was

13

going to kill her. Mr. Bachicha imprisoned the victim in a bedroom, preventing her from escaping. Defendant Campbell reviewed and knew about this offense.

b.     **Bachicha's Prior Serious Assault on Inmate in Adams County Jail:** In 2012 in Adams County, Mr. Bachicha was convicted for assaulting an inmate. Mr. Bachicha had gotten into an unprovoked altercation, and then assaulted the man even though he did not attempt to fight back. Mr. Bachicha attacked him, causing multiple facial fractures requiring hospitalization, and which constituted "serious bodily injury." Defendant Campbell reviewed and knew about this offense.

c.     **Bachicha's Psychosis Leading to Stabbing Attempted Murder:** On January 22, 2017, just two days before Defendant Campbell classified him, Mr. Bachicha was arrested and charged with attempted first degree murder. According to the arrest report Defendant Campbell read, on that date Mr. Bachicha stabbed his step-father four times in the neck with a prison-style "shank" in an obviously psychotic condition. Around noon, Mr. Bachicha, his step-father, and his mother, were in their residence about to watch a football game on TV. It was the NFL playoffs. Everybody appeared happy, and there had been no arguments or altercations going on. Mr. Bachicha and his step-father were seated on the couch. Suddenly, Mr. Bachicha left the room briefly, came back, and started stabbing his step-father unannounced and without provocation. Mr. Bachicha was experiencing apparent delusions or hallucinations, and said something to the effect of "it's him, he wanted to hurt you," to his mother, which was untrue and lacked any basis in reality. His mother attempted to grab the shank and stop the attack, and when she told Mr. Bachicha to stop and give her the shank, he did. She called 911.

14

Mr. Bachicha then sat on the couch and when police arrived he was drinking a can of soda. The handmade "shank" had a 5 inch blade and a handle of wrapped black lace. Defendant Campbell reviewed and was aware of this offense.

52.     In addition to the above information, from Mr. Bachicha's file Defendant Campbell knew Mr. Bachicha posed particular dangers to other detainees in the jail. In the Classification Assessment form he completed, he made selections on the form noting he was aware Mr. Bachicha had prior "**major disciplinary reports and/or disciplinary segregation**" and knew the details of those violent incidents. He specifically noted that Mr. Bachicha suffered from dangerous "**psychological impairment**," that he posed an "**escape risk**," that he was a "**known management problem**."

53.     Making his knowledge of dangerousness abundantly clear, Defendant Campbell specifically checked the box noting Mr. Bachicha was "**potentially violent**."

54.     At the time Defendant Campbell classified Mr. Bachicha into general population, he knew vulnerable people like Mr. Yoemans would be housed in the same pod and even the same cell as Mr. Bachicha, exposing them to an unconstitutional and excessive risk of serious harm.  Defendant Campbell knew vulnerable detainees were incarcerated the jail and would be exposed to Mr. Bachicha's dangerousness, as he was also the employee who classified Mr. Yoemans in September, 2016.

55.     Despite knowing Mr. Bachicha posed an excessive risk to others including Mr. Yoemans, Defendant Campbell classified Mr. Bachicha for placement in general population. Defendant Campbell had more appropriate choices, and should have recommended Mr. Bachicha be housed in a medical or mental health unit, infirmary, segregated cell, or at the least housed

15

without a cellmate. Defendant Campbell knowingly failed to take any appropriate or reasonable steps to protect Mr. Yoemans and other inmates from this excessive and known risk.

56.     The day after Defendant Campbell's placement of Mr. Bachicha in general population, Defendant Ayala became responsible for Mr. Bachicha's housing assignment in the jail. Defendant Ayala was the Deputy who used Defendant Campbell's Classification Assessment to choose a cell for Mr. Bachicha. Defendant Ayala placed Mr. Bachicha in B-Module cell B-231. This occurred on or about January 25, 2017.

57.     In doing so, upon information and belief, Defendant Ayala reviewed the Classification Assessment form completed by Defendant Campbell, which contained the above-referenced information documenting Mr. Bachicha's obvious and extreme dangerousness. Furthermore, upon information and belief, Defendant Ayala communicated with jail staff, likely to include Defendant Campbell, regarding Mr. Bachicha's file and the violence, mental illness, and obvious dangerousness he presented. Like Defendant Campbell, Defendant Ayala had an independent duty to protect other inmates from this excessive risk of violence and serious harm when he became aware of the information and was responsible for selecting a cell for Mr. Bachicha. Regardless of Defendant Campbell's placing Mr. Bachicha in general population, Defendant Ayala knew he independently had a duty to protect other detainees including Mr. Yoemans from Mr. Bachicha, whom he knew to be extremely dangerous.

58.     Despite knowing Mr. Bachicha was mentally ill and posed an excessive risk to others, Defendant Ayala failed to take any appropriate or reasonable steps to protect Mr. Yoemans or other inmates from Mr. Bachicha, failed to place Mr. Bachicha in the medical or mental health unit, infirmary, in segregation from others, or in a solo cell without a cellmate.

59.     These two Classification Defendants knew that Mr. Bachicha posed an excessive and substantial risk to the health and safety of pretrial detainees including Mr. Yoemans, and failed to adequately or reasonably take steps to protect against that extreme risk of serious harm and death.

60.     Additionally, any objectively reasonable officer in the Classification Defendants' position would have known that placing Mr. Bachicha in general population posed an excessive risk to the health, safety, and lives of other pretrial detainees.

### Mr. Bachicha's Cries for Help Ignored

61.     Mr. Bachicha's family weren't the only ones to warn the jail that he needed mental health treatment and separate housing. Upon information and belief, before he killed Mr. Yoemans Mr. Bachicha **himself** asked jail staff, including Defendants Brown, Gilbert, and Yniguez, to be transferred to the medical unit for mental health treatment and medication. These cries for help went unheeded.

62.     Mr. Bachicha was housed on B-Module cell B-231 from the date Defendant Ayala placed him there on January 25, 2017, through to the date he killed Mr. Yoemans, on February 7-8, 2017.

63.     Defendants Brown, Gilbert, Yniguez, and Fisher were the ACSO staff working on B-Module at the time Mr. Bachicha killed Mr. Yoemans. These Defendants are collectively referred to herein as the "Supervision Defendants."

64.     The Supervision Defendants also worked 8-12 hour shifts on B-Module on multiple days in the approximately two weeks before the murder of Mr. Yoemans. Defendant Brown worked on B-Module supervising inmates on January 25, 28, 29, 30, and 31, 2017,

including supervising and interacting with Mr. Bachicha, in the days before he murdered Mr.

Yoemans. Defendant Yniguez worked on B-Module on January 25, February 5 and 6, 2017,

including supervising and interacting with Mr. Bachicha. Defendant Gilbert worked on B-

Module February 5 and 6, 2017, also including supervising and interacting with Mr. Bachicha.

And, Defendant Fisher worked as the Detention Specialist for B-Module on January 25,

February 5 and 6, 2017, in which the goings-on in the unit were communicated to him from the

other Defendants and staff working.

65.      During their shifts, Defendants Brown, Gilbert, and Yniguez worked as Deputies

whose job required direct contact and supervision of detainees including Mr. Bachicha, frequent

daily conversation with these inmates, attending to and responding to inmate requests and needs,

responding to requests for medical or mental health treatment, and in general serving as the point

of contact with the people detained under their watch. These Defendants also handled

transporting inmates, dealing with meal trays, commissary, mail, and conducted "row checks" in

the unit.

66.      Furthermore, activities and problems in the modules were communicated between

deputies from one shift to another; thus issues raised by inmates during the day shift were

communicated to employees working the night shift and vice-versa. Additionally, staff including

the Supervision Defendants, were briefed on inmate issues, dangerousness, and particular needs,

including medication management, mental health issues, medical requests, and other issues that

arise in the course of supervising inmates in the jail.

67.      Upon information and belief, during their prior shifts on B-Module before the

murder, Mr. Bachicha repeatedly requested Defendants Brown, Yniguez, and Gilbert that he be

18

transferred to medical for mental health treatment and medication. Mr. Bachicha also made these same requests to other jail staff working on B-Module, which werecommunicated to these Defendants at the times they worked B-Module shifts, on the dates stated herein.

68.     Upon information and belief, the Supervision Defendants also were aware of Mr. Bachicha's violent history, including his attempted murder pending case, his assaults and major disciplinary issues in the Adams County jail, and his dangerousness to other detainees especially to include Mr. Yoemans, his cellmate. From their own observations of Mr. Bachicha, the Supervision Defendants knew he was obviously unstable and mentally ill, and therefore extremely dangerous given his homicidal conduct.

69.     Upon information and belief, the Supervision Defendants knew Mr. Bachicha requested the medical unit and mental health treatment, knew he was unstable, and knew their failures to address Mr. Bachicha's requests posed an extreme and unconstitutional risk of serious harm and death to other pretrial detainees, and especially Mr. Yoemans, who would be locked in a cell with him each  night. The Supervision Defendants failed to transfer Mr. Bachicha to medical or any other safe alternative, and failed to take any other measures to reasonably ensure the safety of detainees including Mr. Yoemans. Their failure to take any necessary or reasonable measures to protect against this excessive threat constituted deliberate indifference to Mr. Yoemans' and other detainee's safety and well-being.

### Kyle Yoemans' Physical Disabilities and Cognitive Impairments

70.     On the date of his murder, Mr. Yoemans still suffered major physical disabilities and cognitive impairments and was likely incompetent to stand trial. The June, 2016, high-speed

motorcycle accident had nearly killed him. As evidenced in the photographs below, Mr.

Yoemans was an avid motorist prior to the major accident and his death in custody:



71.     From the crash, Mr. Yoemans' injuries including multiple broken bones and

traumatic brain injury which resulted in multiple surgeries and over three months of

hospitalization. Upon his release from hospitalization on or about September 23, 2016, Mr.

Yoemans was transferred to the jail to face pending charges. He needed a wheelchair, was

incontinent, and could not care for himself. Because of these conditions, Mr. Yoemans was

initially housed in the jail's medical infirmary for about three more months, until December of

2016.

72.     The traumatic brain injury Mr. Yoemans' suffered damaged him cognitively, and

likely changed him permanently. Family noticed that he had become more docile, almost

childlike, and described him as "slow." He also seemed happier, apparently relating to the effects

of the brain injury. These observations are demonstrated by evidence of cognitive and memory

deficits that proved long-lasting. His recuperation was slow. Initially, Mr. Yoemans' could

hardly speak. He could not recall what happened, did not know where he was (even after being told), often could not remember his last bowel movement, was at times incontinent, and would not recall information that had to be retold to him even a short time later. He thought the year was 2015, when it was 2016. He did not know who the president was. Even after months of rehabilitation, these deficiencies persisted, and while housed in the jail's infirmary Mr. Yoemans often forgot simple things and did not even know he was in jail.

73.     These photographs show Mr. Yoemans' prior to the occurrence of these debilitating physical and cognitive injuries:



74.     Throughout his struggles Mr. Yoemans' mother, Plaintiff Ishmael, loved and remained close with her son. After the crash in 2016 nearly killed Mr. Yoemans, Ms. Ishmael felt hopeful that her son would recuperate and achieve a measure of peace. With Mr. Yoemans horrific death caused by the Defendants as described herein, those hopes were dashed, and Ms. Ishmael has suffered the most significant grief and loss a parent can endure.

75.     Because cognitive impairment from the crash made him incompetent to stand trial, on December 15, 2016, Mr. Yoemans was transferred to CMHI in Pueblo for further evaluation and treatment. He remained hospitalized there until January 30, 2017, when he was transferred back to the jail. Assessments confirmed cognitive deficiencies and memory deficits due to the severity of his traumatic brain injury. Although transferred back to the jail, as of the date of his death on February 8, 2017, Mr. Yoemans remained incompetent to stand trial.

76.     Physically, at the time of his death Mr. Yoemans remained obviously disabled. He limped badly due to ankle and foot injuries, taking short half-steps with one leg leading. He could only walk short distances, had unsteady gait and trouble balancing. He lacked feeling in his extremities, making walking and moving even more difficult. At times, he would have to lean a hand against the wall or other stationary object to steady himself. He sometimes could not even walk the short distance in the jail to get his medication.

77.     Bones fused in Mr. Yoemans' left hand and arm, further disabling him after the crash. He had limited mobility in his wrist and little use of that hand. Chronic left elbow contraction caused his left arm to bend diagonally with his hand across the chest to his right shoulder, as if the arm were in a sling. He wore a patch over his right eye due to a damaged optic nerve, limiting his vision. Neurological damage caused Mr. Yoemans to shake at times, and limited the feeling in his body.

78.     In short, these severe injuries reduced Mr. Yoemans to a weakened and impaired state, and he was no longer the physically capable person depicted in the photos above. As evidence of his enduring physical limitations, the jail designated Mr. Yoemans bottom-bunk and bottom-tier restricted.

79.     Mr. Yoemans' physical disabilities were obvious to anyone who saw him, and his mental impairments obvious to anyone who interacted with him. These disabilities were well-known to the Supervision Defendants, because they saw and interacted with Mr. Yoemans when they worked in B-Module in the week before the murder.

**Failure to Prevent or Intervene In the Loud and Lingering Murder of Kyle Yoemans**

80.     The murder of Mr. Yoemans on February 7-8, 2017, was loud and long. The horrible sounds of his demise awoke other inmates, reverberated through the walls and ceilings, and echoed down the jail corridors, for at least ten or fifteen minutes and as long as thirty minutes. No one intervened to save him, including the Supervision Defendants on duty that night.

81.     According to Manuel Saenz-Cordona, housed in cell B-230 adjacent to B-231, he heard loud "pounding noises" around midnight the night of February 7-8, 2017, coming from nearby. It sounded like an altercation or struggle between inmates in their cell, and he demonstrated the sounds by using his hands and feet to hit the wall and "stomping on the ground in a pace of approximately a one and a half times per second." He estimated this loud banging went on for about ten minutes. The sound so disturbed him, and went on for so long, that Mr. Saenz-Cordona eventually got up and pounded on the ceiling of his cell to try to get the inmates creating the noise to stop. When the banging did finally stop, he heard someone yell "Now what, now what", and believed it to be Che Bachicha's voice, which he recognized. As he listened to the struggle, Mr. Saenz-Cordona heard a "screeching noise" that he believed to be a desk chair in Mr. Bachicha's and Mr. Yoemans' cell that screeched and squeaked when it moved.

82.     Heath Kinsey, housed in cell B-223, directly above B-231 where Mr. Yoemans was killed, also reported hearing the loud struggle. Mr. Kinsey reported the sound was so loud that both he and his cellmate were awoken by the clatter. He heard loud "banging" and after discussing with his cellmate, decided the noise was coming from down below. Mr. Kinsey reported hearing a "ding" of metal during the banging. He estimated these banging noises continued for fifteen to thirty minutes.

83.     German Rich, housed in cell B-217, some distance away from cell B-231, also heard loud noises emanating from the murder of Mr. Yoemans. Mr. Rich reported hearing the repeated sound of "ding, ding", similar to Mr. Kinsey, and reported it sounded like someone wrestling or fighting within the B-Module housing unit.

84.     Despite the loud volume of the attack and the noisy and metallic banging sounds, and despite the fact that it went on for an extensive period of time, no jail staff, including Supervision Defendants, reported hearing or seeing any part of the approximately 10-30 minute-long murder of Mr. Yoemans.

85.     At about 12:33 a.m. on February 8, 2017, Defendant Gary Brown conducted a row check in B-Module, in which he walked through the corridor and looked into the cells as he passed by. When Defendant Brown looked into cell B-231, he saw Mr. Yoemans lying face down in the corner of the cell with his head in a pool of blood about two feet in diameter, and saw Mr. Bachicha sitting on the floor next to the cell door with a bloody washcloth draped on the back of his neck. Deputy Brown called an emergency code 100, and when additional deputies responded he ordered Mr. Bachicha out of the cell and placed him in handcuffs. Jail medical staff checked Mr. Yoemans for signs of life, but he had no pulse and attempts to revive him failed.

24

Mr. Yoemans was transported to Platte Valley Medical Center, where he was pronounced dead at about 2:08 a.m. the same night.

86.     Investigators observed the grisly evidence of Mr. Bachicha's murder of Mr. Yoemans. They observed blood spatter on Mr. Bachicha's glasses, scratch marks on Mr. Bachicha's back which are consistent with having been caused by Mr. Yoemans trying to defend himself, and saw Mr. Bachicha's bloody, swollen knuckles and hands, injuries consistent with Mr. Bachicha having forcefully struck Mr. Yoemans about the face and body.

87.     Kyle Yoemans died a horrific, painful, and terrifying death. The autopsy revealed injuries too numerous to count to his head, neck, torso, arms, legs, and extremities. He suffered multiple gashes to his forehead and above his eyes, bruising and abrasions to his face, nose, and chin. He suffered subdural hematomas and hemorrhages to his brain and surrounding tissues.

88.     The back of Mr. Yoemans' skull was bludgeoned so forcefully that it was "squishy" and soft to the touch.

89.     To his neck, Mr. Yoemans suffered a large abrasion consistent with being strangled, possibly by a ligature such as an article of clothing. The strangulation abrasion is also consistent with having been caused by his neck being jammed against the rim of the jail cell's toilet bowl, as well as other objects in the jail cell.

90.     In other injuries, hemorrhaging inside Mr. Yoemans' neck, tongue, and other body parts are consistent with him dying of strangulation. Petechial hemorrhages in both eyes, caused by the eruption of blood vessels in the eyes during strangulation, were also observed. Mr. Yoemans suffered bruises to his torso and back, and bruises to his elbow. His right wrist was

fractured and dislocated, injuries he sustained during the awful struggle for his life, which he lost.

91.     Mr. Yoemans' death was ruled a homicide by strangulation. Che Bachicha was charged, tried, and convicted of the murder.

**Supervision Defendants' Failure to Supervise and Monitor**

92.     The night Mr. Yoemans died, Defendants Brown, Gilbert, Yniguez, and Fisher were on duty responsible for supervising and monitoring B-Module. This included cell B-231, where Mr. Bachicha and Mr. Yoemans were locked down together. Defendant Fisher was the Detention Specialist whose job involved monitoring the pod from behind a glass barrier in a duty station. Defendant Fisher had no physical contact with the inmates, but was responsible for monitoring the module from his remote position.

93.     Defendants Brown, Gilbert, and Yniguez were the Deputies on duty supervising the night of the homicide, and they were responsible for maintaining contact with the pretrial detainees and inmates under their watch, including Mr. Bachicha and Mr. Yoemans.

94.     The Supervision Defendants knew that reasonably ensuring safety in B-Module, including B-231, required them to employ "Direct Surveillance," a form of direct contact and supervision described in greater detail below. They failed to do so.

95.     The Supervision Defendants knew blind spots, especially blind spots in the jail cells, afflicted B-Module. From the duty station or some distance away from the cells, the Supervision Defendants knew they could not see into the cells, hear what went on in the cells, or even minimally supervise what went on inside. These blind spots made supervision impossible unless they employed Direct Surveillance and maintained constant supervision of the cells. They

26

also knew they lacked the ability to hear what was going on inside the cells and would not hear major crises including homicides, unless they remained in close proximity and employed Direct Surveillance.

96.    Additionally, Defendant Fisher knew that from his position at the duty station, he lacked direct visual or auditory supervision of inmates in B-Module including cell B-231, and furthermore lacked video surveillance of inside the cell.

97.    The Supervision Defendants employed the least-safe form of supervision available. After the nighttime lockdown, which occurred at about 10:00 p.m. on February 7, 2017, the Supervision Defendants only conducted cursory "row checks" every 30 minutes, in which a single deputy would walk through the corridor and briefly glance into the cells. Therefore, for 30 minutes at a time, the detainees and inmates in B-Module were left unsupervised.

98.    The Supervision Defendants knew that in 30 minutes of unsupervised time, pretrial detainees could kill themselves, die of serious medical issues, and be murdered by their cellmates without anyone seeing, hearing, or intervening. Defendants ignored and were deliberately indifferent to this excessive dangerousness to pretrial detainees including Mr. Yoemans.

99.    The Supervision Defendants knew Direct Surveillance was necessary to reasonably ensure the safety of the pod, including Mr. Yoemans' safety, and failed to implement it. They knew Mr. Bachicha posed an excessive danger to the safety of Mr. Yoemans, who was locked overnight in a cell with him unsupervised for 30 minutes at a time, and they knew row checks every half hour was obviously inadequate to reasonably protect Mr. Yoemans.

100.    The Supervision Defendants knowingly failed to maintain direct visual or auditory contact with inmates in B-Module including Mr. Bachicha and Mr. Yoemans in cell B-231, and knowingly failed to employ Direct Surveillance, in deliberate indifference.

101.    Confirming they failed to adequately supervise B-Module for safety, the Supervision Defendants failed to see, hear, or intervene in the murder of Mr. Yoemans, which was so loud it awoke inmates throughout the pod, involved loud metallic banging and "screeching" noises, and went on for between 10-15 minutes or as long as 30 minutes.

102.    All of the individual Defendants named herein specifically knew that a high number of major incidents including suicides, assaults, and deaths had occurred in jail cells like those in B-Module in the past, they knew the facility was unsafe, knew it was understaffed, and knew from these prior incidents that failing to appropriately separate dangerous detainees like Mr. Bachicha, or employ Direct Surveillance, would expose detainees to an excessive risk of serious harm and death.

**Defendant Wellpath's Long History of Knowing Failure to Protect**

103.    Defendant Wellpath is a multi-million dollar corporation that has been sued over 50 times in recent years for failures leading to serious injury and death of pretrial detainees and other inmates. Defendant Wellpath endorses an ongoing pattern and practice both nationwide and in Colorado of failing to protect the safety and well-being of pretrial detainees and other inmates whose lives depend on them. These failures are knowingly tolerated by the Adams County Defendants, who signed the contract for services with Defendant Wellpath when it was known as CCS in 2016, despite knowing it would not make constitutionally adequate screening or medical decisions, and deliberately indifferent to the predictable consequences.

104.    In almost every instance, similar to Defendant Marshall's decision avoiding sending Mr. Bachicha to the medical unit, Defendant Wellpath employees consistently fail to transfer inmates to medical units or hospitals, leading to major injury and deaths. For instance:

a.      In *Miranda v. Cty. of Lake*, 900 F.3d 335, 341 (7th Cir. 2018), defendants including CCS and its employees failed to protect from self-harm or transfer to hospital Lyvita Gomes, leading to her death.

b.      In 2017, *Estate of Lovern v. CCS, et al*, Case No. 18-cv-2573 (D. Colo), Denny Lovern died in Arapahoe County Detention Facility in Colorado as a result of CCS's deliberate indifference and refusal to send him to medical unit or hospitalize him.

c.      In 2013, Rashod McNulty died in a county jail in New York as a consequence of inadequate care provided by CCS or a related subsidiary, failing to place in medical unit or hospitalize Mr. McNulty. A report concluded CCS employees committed professional misconduct for their failures leading to his death.

d.      In 2011, Donna Pillard died in a Nebraska jail whose medical care CCS was responsible for, leading to a wrongful death suit for failure to treat or transfer to the hospital the sick woman, and a confidential settlement.

e.      In *McGill v. Correctional Healthcare Companies, Inc., et al*, Case No. 1:13-cv-1080-RBJ-BNB (D. Colo.), Kenneth McGill sued CCS over its failure in 2012 to protect his well-being in response to a stroke he suffered in Jefferson County jail in Colorado. This case went to trial and resulted in a plaintiff's verdict of about $11 million, including about $8 million in punitive damages.

f.      In 2014, a company CCS acquired was responsible for the death of John

Walter in Fremont County Detention Center in Colorado, due to the failure to medicate,

monitor, or timely transfer to a hospital, resulting in a settlement for $4.25 million.

g.      In 2013, *Revilla v. Stanley Glanz, et al.* Case No. 4:13-cv-315-JED-TLW

(N.D. Okla.), plaintiffs sued CCS relating to three deaths and one near fatality relating to

CCS's and the jail's "longstanding policy, practice or custom" of refusing to send

inmates with emergent medical needs to the hospital."

h.      In 2015, Jennifer Lobato died in Jefferson County jail in Colorado as a

result of CCS's and other defendants' failures to treat withdrawal symptoms or transfer to

a medical unit or hospital, leading to a $2.5 million settlement against the County and an

confidential settlement against CCS.

i.      In 2016, Matthew McCain died in Durham County jail, North Carolina,

after CCS and its employees failed to timely send him to the hospital or care for his well-

being, leading to a wrongful death lawsuit.

j.      In 2008, *Estate of Bruce R. Howard, et al. v. County of El Paso, Colorado

et al.,* Case No. 1:10-cv-02740-CMA-MEH (D. Colo.), Bruce Howard died after CCS'

staff failed to provide him medication after his arrest, and ignored his pleas for help.

k.      In *Moritz v. Correctional Healthcare Companies, Inc., et al.*, Case No.

4:14-cv-00656-GFK-PJC (N.D. Okla.), Michael Moritz died in Tulsa county jail when

CCS's employees failed to treat him and failed to timely hospitalize him.

      l.     In *Guerrero v. Wichita County, Texas et al.*, Case No. 7:14-cv-0058-O (N.D. Tex.), CCS failed to treat plaintiff's obvious signs of labor or to timely hospitalize her, resulting in the baby dying shortly after its birth on the floor of a solitary cell.

      m.    In *Turley v. Correctional Healthcare Management, Inc., et al*, Case No. 1:10-cv-02772-REB-BNB (D. Colo.), providers CCS was responsible for failed to timely treat Robert Turley or transport him to a medical physician or the hospital, causing significant medical issues from the failure to treat.

      n.    In Pierce County, Washington, prosecutor Grace Kingman stated that a jury would likely find CCS/Conmed (formerly) "incompetent, unprofessional and morally reprehensible" arising from four deaths of inmates under their care in 2013 and 2014, and in which the County sued CCS.

      o.    In 2013, Christina Boshers died in Kitsap County jail in Washington arising from CCS's failure to timely hospitalize or treat her condition, resulting in a lawsuit that likely eventually settled given the parties voluntarily dismissed it before trial.

105.    Similar to Defendant Marshall's failure to send Mr. Bachicha to the medical unit or other appropriate placement the common thread to these and the dozens of other lawsuits filed against Defendant Wellpath and CCS, is the company's and its employees' penchant for cutting corners to save money, knowingly avoiding obligations to transfer inmates to appropriate medical units or hospitals, and shirking its duty to protect the safety and well-being of the pretrial detainees and other inmates.

106.    This pattern reflects a policy and custom of deliberate indifference to the excessive risks of serious harm and death that result all too often as a consequence of their acts

and failure to act, and evinces Defendant Wellpath's failure to train and adequately supervise its employees.

107.    In 2007, the National Commission on Correctional Health Care ("NCCCS") auditors reported serious and systemic deficiencies in the care provided to prisoners by CCS-related companies in the Tulsa jail, including failure to triage sick calls and failure to address health needs in a timely manner.

108.    In 2008, the Department of Justice found that the jail medical program, administered by a CCS-related entity, was constitutionally deficient in a number of regards. Specifically, the DOJ found problems in "providing appropriate access to medical care during emergencies" citing a case where a woman went into premature labor and delivered a baby while handcuffed to a chair rail. This happened after her complaints, including that her water had broken, were ignored. The DOJ found that there were "critical lapses in getting emergency medical care to detainees." The DOJ also noted that they had conducted a previous tour in 2003 and that, despite many years to remedy the violations found, "we generally did not observe improved conditions at the time of the second tour."

109.    In 2009, an Oklahoma Department of Health investigation indicated that deficiencies by CCS-related companies continued unabated despite the abundant notice of the same from NCCCS and DOJ.

110.    In 2010, during a NCCCS audit, high-level employees of CCS attempted to fraudulently change medical records to give the appearance of compliance. NCCCS found deficient care, deficient investigation into deaths, and a lack of timely diagnostic and specialty services. Even after this audit, CCS did not take the corrective measures necessary to alleviate

the obvious and substantial risks to inmate health. High-level CCS employees repeatedly brought to CCS's attention the many serious deficiencies, including chronic failures to triage medical requests, falsification of records, and refusals to treat inmates with life-threatening conditions, but the corporation refused to make any changes to the way CCS-related companies operated.

111.    In November 2011, the Tulsa County Jail's own retained auditor found deficiencies in CCS's care.

112.    In 2011, U.S. Immigration and Customs Enforcement and the U.S. Department of Homeland Security's Office of Civil Rights and Civil Liberties ("CRCL") also conducted a review of the medical care provided by CCS and related companies, reporting: "CRCL found a prevailing attitude among clinic staff of indifference….", "Nurses are undertrained. Not documenting or evaluating patients properly."

113.    Defendant Wellpath's employee Defendant Marshall recklessly and negligently screened Mr. Bachicha for mental health issues and for a housing placement, and recklessly and negligently recommended general population for Mr. Bachicha instead of the abundant other available options as described herein. Defendant Wellpath is vicariously liable for the conduct of Defendant Marshall relating to the wrongful death claim. Defendant Wellpath is also liable under *Monell* liability for the knowing and deliberate indifference of Defendant Marshall, pursuant to the constitutionally infirm policies, customs, procedures, decision-making, and training they implement.

114.    Defendant Wellpath maintains policies and customs endorsing and tolerating the deliberate indifference of its employees, including Defendant Marshall. Defendant Wellpath's indifference involves approving its employees pattern and practice of intentionally refusing to

send inmates to medical or mental health units, which is more costly. Similarly, on information and belief and according to its contract with the County, Defendant Wellpath is responsible for medication costs but has a fixed contract, meaning it saves money when its employees fail to adequately provide medication and treatment to inmates, a practice it therefore endorses by policy, custom and training. Defendant Wellpath also fails to train and supervised its employees, including Defendant Marshall, so they cannot properly fulfill their legal duties including the duty to make screening and housing decisions that will ensure the safety and health of detainees like Mr. Yoemans.

115.    Adams County, in contracting to hire Defendant Wellpath, formerly CCS, to provide mental health screening and other services in 2016, knew about the above incidents and would have known about CCS's systemic and pervasive failures to adequately perform their duties. The County knew about the adverse findings of multiple governmental agencies, CCS's issues with licensure and lack of accreditation, and refusals by CCS to correct its deliberately indifferent policies. Therefore, the County Defendants are liable for the selection of CCS to provide mental health screening and housing placement services as described herein.

**Matrix Report Revealing Defendants' Knew the Jail Was Unsafe and Understaffed**

116.    In 2015, Adams County hired Matrix Consulting Group to conduct a comprehensive survey and review of jail staffing. Matrix consultants interviewed ACDF management and leadership, interviewed jail supervisors, conducted a survey of jail staff, toured the facility, and collected data from a range of other sources. Matrix produced a report

documenting its findings and conclusions.[3] The report was also reviewed by the Sheriff and jail division leadership, as well as the County and Defendant Board of County Commissioners.

117.    Surveys of County staff working at the jail confirmed the facility was unsafe for detainees and dangerously understaffed, and failed to adequately classify inmates and treat the mentally ill:

a.    **93% of employees reported the jail does not operate with an appropriate number of staff**; 90% reported minimum staffing requirements were not being met; and 100% of managers and supervisors reported inadequate staffing;

b.    <u>**84% of staff reported the jail does not have the staff needed to ensure inmate safety**</u>; the report states that employees "**across all levels of the organization agree that there is insufficient staffing to perform work safely,** and it is discussed as the major opportunity for improvement in the qualitative section of the survey";

c.    The jail averages **over 100 inmate-on-inmate assaults per year**, and this number stayed steady or increased despite a decrease in the jail population during the same time period, ***meaning the number of assaults per inmate was increasing***;

d.    The average inmate-to-staff ratio was reported as being 5.1 to 1, and as high as 17.0 to 1, when best practices require the ratio should not exceed 3.5 to 1;

e.    The majority of jail employees reported **inadequate opportunities for training**;

---

[3] *Staffing Requirements Analysis of the Jail Division, Adams County, Colorado*, Matrix Consulting Group (March, 2015), *available at* https://www.matrixcg.net/wp-content/uploads/2016/10/Adams-County-Jail-Division-FR.pdf.

f.     A majority of jail staff reported **the jail does not provide adequate mental health services for inmates**;

g.     The majority of certified employees reported that the jail's classification system, through which inmate housing decisions are made, was ineffective, and the report states that this "suggests that certain **employees, perhaps the individuals involved in classifying the inmates don't believe the current system to be effective**."

h.     A strong majority reported inadequate communication in the jail, and particularly inadequate communication between management and staff;

118.     The Matrix report also noted plainly unsafe aspects of the jail's design and operation, including the lack of direct visual or auditory supervision in cells in the majority of units, including B-Module. This allows blind spots to exist due to the lack of Direct Surveillance.

119.     The report explained the difference between the techniques of "Linear Intermittent Surveillance," "Podular Remote Surveillance", and "Direct Surveillance" of detainees, and highlighted that Direct Surveillance is safest, followed by Podular Remote Surveillance, and Linear Intermittent Surveillance least safe.

120.     The report defined Linear Intermittent Surveillance to include limited supervision, where staff walk through the module corridor "periodically to observe the inmates," and then returning to a duty station some distance away, and that in this technique "staff are not able to see or interact with the inmates from the duty station." It is the least safe option of the three.

121.     The report explained Podular Remote Surveillance to involve a duty station behind glass and other barriers from which staff can "observe the inmates constantly" but have limited interaction with inmates. The report notes that in this technique "**staff are not able to**

**hear the inmates and may not be aware of problems in the unit until they become full-blown crises**."

122.     Direct Surveillance, like it sounds, requires constant and "direct supervision" of the inmates, in which "[n]o physical barriers separate the staff's station from the inmates." Under Direct Surveillance, which is by far the safest mode of supervision, deputies maintain direct visual and auditory supervision over detainees to ensure safety. Direct Surveillance both helps prevent incidents from occurring, and allows for immediate intervention to stop incidents from escalating into crises. Direct Surveillance prevents assaults and deaths from occurring in jails.

123.     The Matrix report emphasized the important of direct supervision to ensure safety, and noted that "To be safe and secure, *jail staff must actively supervise and manage inmate behavior*." (emphasis in original). These concepts of direct versus lesser surveillance are widely-familiar to corrections professionals and were known to the Defendants even before publication of the Matrix report, but the report emphasized and made the Defendants' acutely aware of the dangers of inadequate supervision afflicting the jail.

124.     The County Defendants knew B-Module required Direct Surveillance to operate safely, and failed to implement it. And, while certain modules could have at least employed Podular Remote Surveillance in which constant visual contact was always made, the jail failed even to employ that in B-Module. In policy and custom the mode of supervision employed on B-Module where Mr. Yoemans was killed amounted to the lowest level of supervision, Linear Intermittent Surveillance: deputies merely walked through the corridors every 30 minutes during the overnight lockdown, and failed otherwise to maintain any direct visual or auditory

supervision over the inmates while they were locked in their cells. Staff in the duty station were also unable to see or hear into the jail cells, allowing incidents to grow into uninterrupted crises.

125.    Every Defendant knew Direct Surveillance to be necessary to reasonably supervise severely mentally ill and dangerous detainees like Mr. Bachicha, and knowingly failed to employ or implement it. Even Podular Remote Surveillance was obviously inadequate to supervise extremely dangerous and erratically homicidal detainees like Mr. Bachicha, because— as occurred in this very case—staff are unable to see or hear the inmates and won't know someone is being killed until it is too late.

126.    The Matrix report also noted, as the Defendants already knew, that the jail is equipped for Direct Surveillance including at least in Module F, and that Module F had abundant vacant space that was "moth balled" and available for use. Thus, the jail had ample opportunity to house dangerous inmates like Mr. Bachicha under Direct Surveillance, but due to the decisions made as alleged herein, and likely due to the County's decisions to cut costs rather than ensure detainee safety, they chose not use the available space, indifferent to the known safety consequences. The Defendants knew Mr. Bachicha could've been housed under Direct Surveillance and in a solo cell, and cells remained vacant and available in 2017 at the time he murdered Mr. Yoemans.

127.    The Matrix report was known about and reviewed by Defendant McIntosh and the Board of County Commissioners. Rather than immediately implement Direct Surveillance or take other necessary and reasonable steps to improve the jail's safety and ensure they met their duty to protect pretrial detainees like Mr. Yoemans, the County Defendants focused on how to staff the jail while cutting costs.

38

**Pattern and Practice of Deliberate Indifference to Violence and Deaths**

128.     In addition to the 2015 Matrix report, the County Defendants knew very well

from experience and the frequency of major incidents and deaths in the jail, that the facility

suffered from unconstitutional deficiencies in the screening, classification, housing, and

supervision of detainees. As noted above, they knew before the report that the jail averaged over

100 inmate-on-inmate assaults per year, an intolerably high number, and that the problem was

only getting worse, with assaults per inmate increasing over time.

129.     The County Defendants also knew the jail had approximately double the rate of

deaths compared to similar regional jails, a major red flag. Under the County's watch, the jail

consistently suffered an uncommon and excessive number of serious incidents, including deaths.

In 2015 and 2016, at least seven people died in the Adams County jail, *including four in a span*

*of three months in 2015*.

130.     Combined with their knowledge detainees were subjected to an average of over

100 assaults per year in the facility and totally inadequate supervision practices as described

herein, the high rate of deaths told the County they failed to adequately supervise detainees.

Whether from suicide, lack of medical treatment, failure to screen for mental health issues, or in

Mr. Yoemans' case failure to protect from other inmates—these incidents all result from the

same systematic and deliberately indifferent failures. This pattern and practice continued up to

and including causing the death of Kyle Yoemans.

**The County Defendants Knowingly Failed to Stop-Gap**

131.     In further evidence of the County's knowing and deliberate indifference to

excessive dangers in ACDF, as early as 2012 the County Defendants knew they faced a mental

39

health crisis in the jail, and that the facility needed a mental health wing to house and treat the

severely mentally ill. In 2012, then-Sheriff Doug Darr, a predecessor to Defendants McIntosh

and Reigenborn, admitted the need for a specialized unit to house and treat the severely mentally

ill, which the jail lacked. The Sheriff knew many people came into custody with mental health

issues and stated "we need to be on top of it" by housing and treating the mentally ill

appropriately.

132.    The Sheriff and the County knew that failing to adequately house and treat the

severely mentally ill posed an excessive risk to the health and safety of all detainees and inmates.

133.    Lacking a mental health unit, the jail in 2012 and up to and including the date of

Mr. Yoemans' death, relied on the medical unit to house the mentally ill. However, the medical

unit also housed physically sick or infirm inmates having no mental health issues, and was an

improper and inadequate place to house severely mentally ill detainees.

134.    As early as 2012, the County Defendants knew the medical unit was dangerously

over-crowded and not equipped to house all of the mentally ill inmates that should be separated

from others. The County Defendants also knew that housing dangerously mentally ill people in

general population was even more unsafe, and excessively endangered detainees. The County

Defendants began a process of creating a mental health wing for the jail, demonstrating that they

knew separating dangerously mentally ill people was necessary to reasonably ensure safety.

135.    However, a mental health wing did not open in the jail until December of 2017—

*over five years later*—much too little, too late for Kyle Yoemans. In the meantime, the County

Defendants failed to implement stop-gap solutions to the mental health crisis in their jail, leaving

Mr. Yoemans and other detainees at risk.

136.     Between 2012 when they knew of the need for a mental health unit and 2017 when Mr. Yoemans died, the County Defendants failed to make use of available and vacant parts of the jail to house mentally ill people separately.

137.     As of January 22-February 8, 2017, at the time Mr. Bachicha was screened and the mental health wing was reportedly being "refurbished."

138.     On information and belief, at the time of Mr. Yoemans' death, the jail was the only large jail in the region that failed to provide a housing unit for seriously mentally ill inmates like Mr. Bachicha.

139.     The County Defendants knew that as of the time of Mr. Bachicha's screening and the date of the murder, the jail was plagued by violence and preventable deaths and failed to adequately house and treat seriously mentally ill people. The County Defendants knowingly failed to take action to prevent Mr. Yoemans' death, in deliberate indifference to the consequences.

140.     Knowing that the jail's lack of a mental health unit made the facility dangerous, the County Defendants failed to take adequate safety measures while that medical wing was being constructed. The County Defendants had a duty to take necessary and reasonable measures to protect pretrial detainees like Mr. Yoemans in the meantime, which it failed to do.

141.     The County Defendants implemented policies it knew to be extremely dangerous and contrary to its superficial commitment to safety. The County Defendants, on the one hand, had official policies requiring separation of violent and seriously mentally ill inmates from others, and keeping them under constant direct supervision. Nevertheless, the County Defendants implemented actual policies and customs directly contradicting and undermining those goals, as

41

described herein, resulting in homicidally psychotic people like Mr. Bachicha being placed in general population. This amounted to a policy and custom of knowingly commingling extremely dangerous, severely mentally ill detainees with other not mentally ill detainees in general population and in jail cells, contrary to the County Defendants' recognition this was excessively dangerous.

142.    Furthermore, at the time Mr. Bachicha was classified and when Mr. Yoemans was killed, the jail had available cells to house dangerous inmates like Mr. Bachicha without a cellmate, or in other forms of separation from vulnerable people like Mr. Yoemans.

**The County Defendants' Policies, Customs, Procedures and Training**

143.    The County Defendants, including the Sheriff, knew and recognized the importance of careful screening, classifying, housing, and supervision of dangerous and mentally ill inmates. Despite this, the County Defendants (and Defendant Wellpath) implemented policies, customs, procedures, and training which directly undermined jail safety and created an excessive risk of serious harm to detainees like Mr. Yoemans, including the following:

a.      The County Defendants knowingly implemented official policies, customs, and procedures allowing inadequate screening procedures by Defendant Wellpath and its employees including Defendant Marshall; failed to adequately supervise or train  employees, including Defendant Marshall; and failed to ensure that obviously dangerous,  mentally ill inmates like Mr. Bachicha be housed separately from other detainees like Mr. Yoemans;

b.      The County Defendants knowingly implemented official policies, customs, and procedures allowing the excessively dangerous commingling of seriously

mentally ill detainees like Mr. Bachicha with regular detainees in general population, under excessively dangerous conditions and without adequate supervision;

     c.     The County Defendants knowingly implemented official policies, customs, and procedures of operating the jail in a woefully and dangerously understaffed way, which it knew to be excessively dangerous to the safety of detainees like Mr. Yoemans;

     d.     The County Defendants, Defendant the Board of County Commissioners, knowingly implemented official policies, customs, and procedures of deliberate indifference by failing to adequately fund ACDF to reasonably improve staffing or otherwise ensure the safety of pretrial detainees like Mr. Yoemans, and in disregard to the known risks of injury and death that could and did result;

     e.     The County Defendants knowingly implemented official policies, customs, and procedures of inadequate classification and housing procedures for County Staff including the Classification Defendants, failing to require that obviously dangerous, mentally ill inmates like Mr. Bachicha be housed separately from other detainees like Mr. Yoemans;

     f.     The County Defendants knowingly implemented official policies, customs, and procedures endorsing inadequate supervision of detainees, and knowing indifference to the blind spots and inability to maintain visual or auditory supervision afflicting B-Module, and failed to implement Direct Surveillance in B-Module where it detained dangerous and mentally unstable people like Che Bachicha;

g.      The County Defendants knowingly implemented official policies, customs, and procedures approving lack of supervision by deputies including the Supervision Defendants working in the jail, especially B-Module, by failing to require direct visual and auditory supervision or other form of direct supervision; instead, the official policy, custom, and procedure merely involved periodic "row checks" every 30 minutes, which the County Defendants knew was obviously inadequate to ensure safety, and would be extremely dangerous to detainees including Mr. Yoemans;

h.      The County Defendants knowingly implemented official policies, customs, and procedures, of knowingly inadequate surveillance from B-Module's duty station, in that Detention Specialist Defendant Fisher and other staff lacked constant surveillance inside the cells;

i.      The County Defendants knowingly implemented official policies, customs, and procedures of inadequate training of its employees and the employees of Defendant Wellpath in how to screen, classify, and supervise detainees, as described herein, including the Defendants;

j.      The County Defendants knowingly implemented official policies, customs, and procedures of inadequate supervision of its employees, including the Defendants, as described herein;

k.      The County Defendants knowingly implemented official policies, customs, and procedures of inadequate communication between employees and between staff and management, further undermining the staff's already-deficient training and capabilities.

44

144.    These policies, customs, and procedures as described above were the moving force behind the individual Defendants' unconstitutional conduct, and the moving force behind Plaintiffs' injuries and damages.

145.    Furthermore, the County Defendants on many occasions exercised their final decision-making and policymaking authority, failing to remedy the well-known dangers plaguing the jail. From as early as 2012 up to and including the date of Mr. Yoemans death in 2017, the County Defendants chose not to promptly create a mental health unit, decided not to put in place reasonable stop-gap measures while a mental health unit was implemented, and failed to make constitutionally-adequate decisions on how to safely operate the jail for the protection of pretrial detainees including Mr. Yoemans. Their decisions were knowingly and deliberately indifference to the excessive risks of serious injury and death.

146.    Additionally, the County Defendants ratified and approved the constitutionally infirm decisions being made throughout the years when the County failed to remedy or stop-gap the mental health and safety crisis in its jail. Adams County ratified the decisions of the Defendant McIntosh and his predecessors, in which the County Defendants  failed to ensure the safety and protection of detainees like Mr. Yoemans.

147.    The policy decisions of the County Defendants were the cause and moving force of Defendants unconstitutional conduct, and the moving force causing Plaintiffs' injuries and damages.

**Defendant McIntosh's Personal Knowledge and Supervisory Liability**

148.    Defendant Michael McIntosh was Sheriff of Adams County from 2015 up through the time of Mr. Yoemans' death. For many years before that date, he served as an

45

Adams County Sheriff and was aware of problems with violence and deaths in the jail predating his tenure as Sheriff. Defendant McIntosh is sued in his individual capacity under supervisory liability, because he was personally aware of and directly responsible for the extremely dangerous conditions that led to Mr. Yoemans' death.

149.    Defendant McIntosh was also aware of his predecessors' belief as early as 2012 that the jail faced a mental health crisis and badly needed a specialized mental health wing to house and treat the dangerously and severely mentally ill. Defendant McIntosh agreed with this view, but as with his predecessor and the County Defendants generally, he failed to implement adequate stop-gap measures while the mental health wing was being designed and constructed.

150.    Defendant McIntosh was involved with Matrix's process of creating the report described herein. He participated in Matrix's review of the jail's staffing, he read the report afterward, and he was personally and subjectively aware of its contents.

151.    Defendant McIntosh was personally and subjectively aware of the precise problems with B-Module, and the jail overall, that would lead to Mr. Yoemans' death, and he failed to take necessary measures to ensure his safety. Defendant McIntosh was aware of the yearly average of 100+ assaults on inmates and detainees in the jail—*including in jail cells like Mr. Yoemans' in B-Module*—leading up to Mr. Yoemans' death; he was aware of the high rate of suicides and deaths in the jail; he was aware that many of these assaults and deaths occurred in the jail cells, where there are extremely dangerous "blind spots" and limited supervision of inmates; he knew Direct Surveillance is necessary to reasonably ensure the protection and safety of detainees like Mr. Yoemans, particularly in areas housing mentally ill and dangerous inmates; he knew B-Module housed mentally ill and dangerous inmates like Mr. Bachicha, and that it

failed to employ Direct Surveillance; he knew Detention Specialists like Defendant Fisher could not see or hear incidents going on in the B-Module jail cells from the duty station, until it was too late; he knew more vulnerable inmates like Mr. Yoemans were housed in B-Module, also not under Direct Surveillance.

152.    Defendant McIntosh was acutely subjectively aware of the specific particular dangerous conditions that would result in Mr. Yoemans' death and affecting the specific subset of people exposed to these dangers.

153.    Defendant McIntosh failed to implement Direct Surveillance despite knowing well before Mr. Yoemans' death that "Direct supervision is proven to reduce fights, sexual assaults, and suicides."

154.    Defendant McIntosh knew that unless he ordered his deputies to maintain constant direct supervision of detainees like Mr. Bachicha, serious injury and death would result. Despite this, he knew that the Supervision Defendants working in B-Module lacked direct visual or auditory supervision of the cells, including cell B-231 where Mr. Yoemans was killed. He knew "row checks" every 30 minutes was insufficient to adequately supervise the jail cells, and would amount to periodic checks for bodies after deaths had taken place. Despite knowing this, Defendant McIntosh failed to take appropriate or reasonable measures to ensure the safety of Mr. Yoemans and other pretrial detainees housed in B-Module.

155.    Defendant McIntosh knew that the jail had empty cells and vacant areas that he could use to house inmates in solo cells or under Direct Surveillance at all times relevant including when Mr. Bachicha was classified and Mr. Yoemans housed with him. Defendant

McIntosh knowingly and intentionally chose not to make use of those vacant cells and areas, indifferent to the serious risks it posed.

156.    Publicly, Defendant McIntosh expressed deliberate indifference for the safety of pretrial detainees under his watch. For instance, when inadequate mental health screening, housing, and lack of supervision led to *four deaths in his jail in a mere three months in 2015*, Defendant McIntosh was indifferent to the problem. Regarding suicides, which are easily preventable if detainees are adequately screened and supervised, Defendant McIntosh minimized his responsibility to protect detainees, stating "It's not hard to do that [kill yourself] in our setting." Disagreeing with Defendant McIntosh, a national expert reported that such jail deaths should be taken as an urgent opportunity to review policies and procedures. Abundant evidence and research Defendant McIntosh was well-aware of confirms that suicides can be minimized and prevented through appropriate screening, housing, and supervision.

157.    Despite being subjectively aware that he could prevent suicides, assaults, and other jail deaths—like the one that befell Mr. Yoemans—if he improved policies and procedures, including improving screening and classification processes, improving staffing to safe levels, and requiring Direct Surveillance for homicidal, mentally ill inmates like Mr. Bachicha. He knowingly failed to do so, leading directly to Mr. Yoemans' death.

## V.      STATEMENT OF CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1983—Fourteenth Amendment Violations
### (Plaintiff the Estate Against Defendants Marshall, Campbell, Ayala, Brown, Gilbert, Yniguez, and Fisher)

158.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

159.    42 U.S.C. § 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person with the jurisdiction thereof to the deprivation of any rights, privileges, immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . .

160.    Mr. Yoemans was a citizen of the United States and the entity and official capacity defendants to this claim are persons for purposes of 42 U.S.C. § 1983.

161.    At all times relevant to this action, Defendants were acting under color of state law in their actions and inaction.

162.    At all times relevant, Mr. Yoemans was a pretrial detainee, neither convicted of any crime nor sentenced to any punishment, protected by the due process clause of the Fourteenth Amendment to the United States Constitution. Mr. Yoemans had a clearly established right to safety and well-being, and to be protected from injury and death at the hands of other detainees or inmates.

163.    At all times relevant to this Complaint, the Defendants knew of these clearly established constitutional rights of pretrial detainees, and knew that their conduct violated clearly

established law; and, any objectively reasonable law enforcement officer would have known of this clearly established law.

164.    Defendants' actions and inactions deprived Plaintiff of his Constitutional right to protection as a pretrial detainee. Defendants were deliberately indifferent to known and excessive risks of serious harm to Mr. Yoemans.

165.    For the many reasons stated herein and incorporated by reference, the named individual are liable under 42 U.S.C. § 1983 for the violations of Mr. Yoemans' rights under the Fourteenth Amendment by acting with deliberate indifference to his safety and disregarding the excessive risks of serious harm described herein, despite being expressly aware of the excessive dangers to health and safety posed; and, any objectively reasonable officer would've known that Defendants' conduct posed an excessive risk to the safety of other detainees, including Plaintiff.[4]

---

[4] Plaintiff alleges for all § 1983 claims herein that Defendants are liable under a subjective standard of deliberate indifference as stated herein. However, for every § 1983 claim herein Plaintiff also pleads these allegations under an objective standard because, as Plaintiff contend sand as the Tenth Circuit itself has suggested, existing precedent should be revisited in light of the Supreme Court's application of an objective standard to pretrial detainees under the Fourteenth Amendment. *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015) (objective standard applies in pretrial detainee context); *Perry v. Durborow*, 892 F.3d 1116, 1122 n.1 (10th Cir. 2018) (noting "we question" whether the subjective standard should apply to pretrial detainee following *Kingsley*); *Castro v. County of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016) (holding object standard proper, "we are persuaded that *Kingsley* applies, as well, to failure-to-protect claims brought by pretrial detainees against individual defendants under the Fourteenth Amendment."); *Gordon v. County of Orange*, 888 F.3d 1118 (9th Cir. 2018); *Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017) (following *Kingsley* to apply objective reasonableness standard to deliberate indifference claim in pretrial detainee context); *Miranda v. Cty. of Lake*, 900 F.3d 335, 352 (7th Cir. 2018) (following *Kingsley* to apply objective unreasonableness standard to deliberate indifference claim in pretrial detention context).

166.   Each of the Defendants identified herein subjectively knew about and was deliberately indifferent to the dangers posed, which they intentionally and deliberately disregarded; and, they knew of these excessive risks because they were obvious to them.

167.   Defendants' knowing conduct constituted deliberate indifference and willful and wanton disregard to the excessive, substantial risks of serious harm and death to Plaintiff, depriving Plaintiff of life's necessities and life itself, failing to provide Plaintiff safe or humane conditions of pretrial detention, failing to protect Plaintiff's health, safety, and well-being, in violation of Plaintiff's Fourteenth Amendment due process rights, including the right not to be deprived of his life.

168.   Defendants knowingly, intentionally, willfully, and maliciously disregarded the obvious risks of bodily injury and death to Plaintiff, failed to provide humane conditions of pretrial detention, deprived Plaintiff of life's necessities and life itself, and violated Plaintiff's Fourteenth Amendment right to due process, resulting in substantial harm and death to Plaintiff.

169.   The acts or omissions of Defendants were the legal and proximate cause and the moving force behind Plaintiffs injury and damages, and Mr. Yoemans endured grievous pain and suffering and died as a result of Defendants' failure to protect him.

170.   All of the deliberately indifferent acts of each individual Defendant were conducted within the scope of their official duties and employment.

171.   The County Defendants had a non-delegable duty to provide constitutionally adequate conditions of confinement protecting the safety of pretrial detainees including Mr. Yoemans.

172.    Plaintiff is entitled to and will seek punitive damages against these Defendants in that their actions were taken maliciously, willfully, or with a reckless or wanton disregard of the constitutional rights of Plaintiff.

173.    Plaintiff is entitled to attorney fees and costs pursuant to 42 U.S.C. § 1988, prejudgment interest and costs as allowable by federal law.

**SECOND CLAIM FOR RELIEF**
**42 U.S.C. § 1983—14th Amendment—Supervisory Liability**
**(Plaintiff the Estate Against former Sheriff Mike McIntosh in his individual capacity)**

174.    Plaintiff incorporates all other paragraphs of this Complaint as if fully stated herein.

175.    At all times relevant to this action, Defendant McIntosh was acting under color of state law in his actions and inaction.

176.    Defendant Michael McIntosh, formerly the Sheriff of Adams County and the Sheriff at the time of Mr. Yoemans' death, is sued in his individual capacity for supervisory liability because he subjectively and personally knew about the extreme and excessive risks the jail conditions posed to pretrial detainees including Mr. Yoemans, was deliberately indifferent to those serious and excessive risks of serious harm, and his conduct is affirmatively linked to Mr. Yoemans' death. Any objectively reasonable officer in Defendant McIntosh's position would have known his action and inaction posed an excessive risk to the safety of detainees including Mr. Yoemans, and would be deliberately indifferent to these excessive risks of serious harm.

177.    Defendant McIntosh directly participated in and knew about, encouraged, sanctioned, approved, and consented to the unconstitutional conduct of the other individual

Defendants, as described herein and incorporated by reference, directly causing Plaintiff's damages.

178.    Defendant McIntosh knew of Mr. Yoemans' clearly established constitutional rights to safety and protection as a pretrial detainee, and knew that his deliberate indifference and failure to protect violated clearly established constitutional law; and, any objectively reasonable law enforcement officer would have known of this clearly established law.

179.    Defendant McIntosh's knowing, deliberate decisions failing to protect Mr. Yoemans as a pretrial detainee by exposing him to the excessive risks of serious harm described herein, was also in and willful and wanton disregard to the excessive, substantial risks of serious harm and death to Plaintiff, depriving Plaintiff of life's necessities and life itself, failing to provide Plaintiff safe or humane conditions of pretrial detention, failing to protect Plaintiff's health, safety, and well-being, in violation of Plaintiff's Fourteenth Amendment due process rights, including the right not to be deprived of his life.

180.    Defendant McIntosh knowingly, intentionally, willfully, and maliciously disregarded the obvious risks of bodily injury and death to Plaintiff, failed to provide humane conditions of pretrial detention, deprived Mr. Yoemans of life's necessities and life itself, and violated Mr. Yoemans' Fourteenth Amendment right to due process, resulting in substantial harm and death to Mr. Yoemans.

181.    The acts or omissions of Defendant McIntosh were the legal and proximate cause and the moving force behind Plaintiffs injury and damages, and Mr. Yoemans endured grievous pain and suffering and died as a result of Defendant McIntosh's failure to protect him.

182.   All of the deliberately indifferent acts of Defendant McIntosh were conducted within the scope of his official duties and employment.

183.   Plaintiff is entitled to and will seek punitive damages against Defendant McIntosh in that his actions were taken maliciously, willfully, or with a reckless or wanton disregard of the constitutional rights of Plaintiff.

184.   Plaintiff is entitled to attorney fees and costs pursuant to 42 U.S.C. § 1988, including prejudgment interests and costs as allowable by federal law.

### THIRD CLAIM FOR RELIEF
### 42 U.S.C. § 1983—14th Amendment—*Monell* Liability
### (Plaintiff the Estate Against Defendants Wellpath, Sheriff Richard Reigenborn in his official capacity, and the Board of County Commissioners of Adams County)

185.   Plaintiff incorporates all other paragraphs of this Complaint as if fully stated herein.

186.   Defendant Wellpath is a private corporation that, when formerly known as Correct Care Solutions, LLC, as stated herein, contracted with Adams County to provide services including screening pretrial detainees for mental illness and making a determination as to their housing placement.

187.   Defendant Wellpath, at all times relevant, was acting under color of state law, as the functional equivalent of a municipality providing medical care to pretrial detainees. [5]

---

[5] Plaintiffs will also argue that the Tenth Circuit case of *Smedley v. Corr. Corp. of Am.*, 175 F. App'x 943, 946 (10th Cir. 2005) should be revisited and overruled and that respondeat superior should apply to private entities in § 1983 actions. *See Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 795 (7th Cir. 2014) ("For all of these reasons, a new approach may be needed for whether corporations should be insulated from respondeat superior liability under § 1983. Since prisons and prison medical services are increasingly being contracted out to private parties, reducing private employers' incentives to prevent their employees from violating inmates'

188.    The County Defendants, at all times relevant, were acting under color of state law in their actions and inaction.

189.    The County Defendants are subject to non-delegable liability for the constitutional violations of Defendant Wellpath and its employees.

190.    As a result of the allegations contained in this Complaint, these Defendants are liable under 42 U.S.C. § 1983 for maintaining deliberately indifferent policies, customs, procedures, decision-making, and training that resulted in the violation of Mr. Yoemans' Fourteenth Amendment due process rights, including his right to be protected and kept safe.

191.    These Defendants knew that these policies, customs, procedures, decision-making, and training, posed an excessive risk of serious harm to pretrial detainees like Mr. Yoemans, and it was obvious that such serious harm would occur. Nevertheless, Defendants failed to take reasonable steps to alleviate those substantial risks. There is an affirmative causal link between the deliberate indifference of the individual Defendants towards Mr. Yoemans' protected rights and the policies, procedures, customs, decision-making, and training described herein, which were also the moving force behind the Defendants' unconstitutional conduct and the moving force resulting in Plaintiffs' injuries and damages, including his death.

192.    The County Defendants are liable under 42 U.S.C. § 1983 for the deliberate indifference of the Supervision Defendants and Classification Defendants as described herein,

---

constitutional rights raises serious concerns. Nothing in the Supreme Court's jurisprudence or the relevant circuit court decisions provides a sufficiently compelling reason to disregard the important policy considerations underpinning the doctrine of respondeat superior. And in a world of increasingly privatized state services, the doctrine could help to protect people from tortious deprivations of their constitutional right.").

Defendant McIntosh as described herein, and Defendants Wellpath and Marshall as described herein.

193.     In light of the duties assigned to their workers including Defendant Marshall, the need for more or different training and supervision of them by Defendant Wellpath and the County Defendants was so obvious and so likely to result in constitutional violations if unmet, that the County Defendants and Defendant Wellpath's failure to do so was deliberately indifferent to the rights of Plaintiffs and the relevant public, and was a moving force in the injuries and death of Mr. Yoemans.

194.     The unconstitutional acts and omissions of Defendant Wellpath and the County Defendants were the moving force in the unconstitutional acts of the individual defendants, and the moving force resulting in the injuries and damages suffered by Plaintiff.

195.     As a direct and proximate result of these Defendants' unlawful conduct, Plaintiff has suffered injuries and losses entitling it to recover its compensatory and special damages, including for extreme physical pain and suffering before and during his death, loss of constitutional rights, loss of life, all in amounts to be proven at trial.

196.     Plaintiff is entitled to and will seek punitive damages against Defendant Wellpath, in that its actions were taken maliciously, willfully, or with a reckless or wanton disregard of the constitutional rights of Mr. Yoemans.

197.     Plaintiff is entitled to attorney fees and costs pursuant to 42 U.S.C. § 1988, including prejudgment interests and costs as allowable by federal law.

## FOURTH CLAIM FOR RELIEF
### Wrongful Death
### (Plaintiff Aimee Ishmael Against Defendants Wellpath and Janice Marshall)

198.    Plaintiff incorporates all other paragraphs of this Complaint as if fully stated

herein.

199.    Plaintiff Aimee Ishmael is the mother of Kyle Yoemans, who died without a

spouse or children, and is authorized to file suit under the Colorado Wrongful Death Act.

200.    Defendant Wellpath is a private corporation that, when formerly known as

Correct Care Solutions, LLC, as stated herein, contracted with Adams County to provide services

including screening pretrial detainees for mental illness, dangerousness to self and others, and

making a determination as to their housing placement.

201.    Defendant Janice Marshall was at all times relevant employed as a nurse by

Defendant Wellpath, formerly known as CCS, and her duties included being responsible for

screening arrestees for mental health risks and making a recommendation as to their housing

placement.

202.    Defendant Wellpath is vicariously liable for the negligent acts and omissions by

their agents and/or employees, including but not limited to Defendant Marshall and other

medical or other workers, whether or not they are named defendants.

203.    Defendants Wellpath and Marshall are private persons and entities for purposes of

this claim, not public employees, and therefore are not entitled to immunity under the CGIA.

204.    Defendant Marshall, a nurse, had duties of care to appropriately screen Mr.

Bachicha for mental illness, to screen him for dangerousness to self or others, to make an

appropriate housing determination, to document his mental illness and dangerousness and

communicate that to appropriate jail staff, and to make decisions that will protect the safety of

other pretrial detainees, including Mr. Yoemans. These duties of care required Defendant

Marshall to ensure she made housing decisions to protect the safety and well-being of the pretrial

detainees and other inmates held in custody in the jail.

205.     Defendant Wellpath had a duty to implement reasonable policies, customs,

procedures, training, supervision, and decision-making, and to exercise reasonable care,

regarding their employees working at the jail, including Defendant Marshall, in the screening of

inmates for mental illness and housing placements.

206.     These duties of care are informed by state law, which under C.R.S. § 16-3-403

mandates that "persons arrested or in custody shall be treated humanely and provided with

adequate food, shelter, and if required, medical treatment." Humane treatment requires safety

and protection from serious harm and death, and adequate shelter requires housing placements

that will ensure the safety of persons held in custody. Adequate medical treatment requires

placing severely mentally ill people, including Mr. Bachicha, in medical units or other

appropriate therapeutic housing for their own well-being and for the safety of others. Defendant

Marshall failed to meet these duties of care.

207.     Defendant Marshall breached her duty of care when she knowingly, recklessly,

and negligently screened Mr. Bachicha, whom she knew to be severely mentally ill and

psychotically homicidal and a danger to himself or others, and failed to place him a medical unit

or other appropriate housing placement as described herein, and approved him for general

population.

208.    Defendant Wellpath breached its duties as articulated herein, and is vicariously liable for the reckless and negligent acts and omissions by their agents and/or employees, including Defendant Marshall, and other individuals not named herein. Defendant Wellpath is also directly liable for its own reckless and negligent failures in training, policies, practices, and supervision.

209.    Defendant Wellpath knew or should have known that the lack of supervision, training, and experience among their employees and agents was likely to harm detainees in their care and affected by their decisions, including Mr. Bachicha and Mr. Yoemans.

210.    In failing to exercise reasonable care to meet the duties described herein, Defendant Wellpath and Marshall recklessly and negligently caused Plaintiff's injuries and damages including Mr. Yoemans' death. The reckless and negligent acts and omissions by these Defendants also were a substantial and significant contributing proximate cause of the death of Mr. Yoemans and Plaintiffs' damages.

211.    As a direct and proximate result of these Defendants' unlawful acts and omissions, Plaintiff suffered damages, losses, and injuries in an amount to be determined by a jury at trial. These damages include, *inter alia*, pain and suffering, upset, grief, loss of society and companionship, anger, depression, and all other damages as allowed under the Colorado Wrongful Death Act.

212.    As a result of Defendants' acts and omissions as described herein, Plaintiff suffered particularly grievous pain, suffering, and other damages as described above.

213.    Plaintiff has suffered and continues to suffer economic and non-economic damages due to Defendants' reckless and negligent conduct toward Mr. Yoemans, including

funeral expenses and financial losses, non-economic damages for grief and suffering, loss of her son's companionship, impairment in the quality of her life, inconvenience, pain and suffering, and extreme emotional distress. Plaintiff is therefore entitled to general and compensatory damages and to special damages.

214.    Defendants consciously disregarded a substantial and unjustifiable risk that they knew or should have known would cause the death of another.

WHEREFORE, Plaintiffs respectfully requests that this Court enter judgment in their favor and against the Defendants, and award Plaintiffs all relief as allowed by law and equity, including, but not limited to the following:

      a.   Declaratory and injunctive relief, as appropriate;

      b.   Actual economic damages as established at trial;

      c.   Compensatory damages, including, but not limited to those for past and future pecuniary and non-pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of life and enjoyment of life, and other non-pecuniary losses;

      d.   Punitive damages on all federal claims as allowed by law in an amount to be determined at trial against all individual defendants and corporate defendants;[6]

      e.   Issuance of an Order mandating appropriate equitable relief;

      f.   Pre-judgment and post-judgment interest at the highest lawful rate;

      g.   Attorney fees and costs; and

---

[6] Plaintiff Ishmael also anticipates seeking punitive damages for the state law claim upon suitable amendment after completing substantial discovery.

      h.   Such further relief as justice requires.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

DATED this 29th day of January, 2019.

                                     *s/ David G. Maxted*
                                       David G. Maxted
                                       Jeffrey S. Pagliuca
                                       HADDON, MORGAN AND FOREMAN, P.C.
                                       150 East 10th Avenue
                                       Denver, CO 80203
                                       Phone:   303.831.7364
                                       Fax:      303.832.2628
                                       Email:   dmaxted@hmflaw.com;
                                       jpagliuca@hmflaw.com
                                       *Attorneys for Plaintiff*