IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No 19-cv-00249-RBJ

THE ESTATE OF KYLE CHRISTOPHER YOEMANS, by and through its putative personal
representative Aimee Ishmael, and
AIMEE ISHMAEL, individually,

      Plaintiffs,

v.

CHRISTOPHER CAMPBELL, individually,
MICHAEL MCINTOSH, individually,
RICHARD REIGENBORN, in his official capacity as Sheriff of Adams County, and
THE BOARD OF COUNTY COMMISSIONERS OF COUNTY OF ADAMS, COLORADO,

      Defendants.

---

## ORDER

---

This matter is before the Court on defendants' motion for summary judgment.  ECF No. 88.  For

the reasons outlined below, defendants' motion is DENIED.

## I. FACTS

This is a case where immeasurable tragedy meets us at every turn.  The following facts are not in

dispute.  On February 7, 2017 Che Bachicha, an inmate at the Adams County Detention Facility

("ACDF"), murdered his cellmate, twenty-six-year-old Kyle Yoemans.  Mr. Bachicha suffered from

both bipolar disorder and post-traumatic stress disorder.  ECF No. 91-4 at 4.  Mr. Yoemans' mother,

Aimee Ishmael, and Mr. Yoemans' estate ("plaintiffs") have filed suit against ACDF employee

Christopher Campbell, and former Sheriff Michael McIntosh, in their individual capacities; current

1

Sheriff Richard Reigenborn in his official capacity; and the Adams County Board of County Commissioners ("defendants").  ECF No. 61.

Plaintiffs claim that defendant Campbell violated Mr. Yoemans' Fourteenth Amendment due process rights when he classified Mr. Bachicha as a maximum-security inmate and cleared him to have a cellmate.  Plaintiffs next claim that then-Sheriff McIntosh's management actions—and inactions— caused Mr. Yoemans' death.  Finally, plaintiffs allege *Monell* liability against defendants Reigenborn and the Adam County Board of County Commissioners ("county defendants").  Although Mr. Yoemans was murdered on February 7, 2017, there are several months—and in some cases years—of events that must be discussed to fully contextualize plaintiffs' claims.

**A. <u>Events Leading Up to and Following Mr. Yoemans' Arrest</u>**

On June 6, 2016 police were dispatched to 580 East 116th Avenue, North Glenn, CO in response to a suspected shooting.  ECF No. 88-5 at 7.  A man—later confirmed to be Mr. Yoemans—left the shooting location on a motorcycle at a high rate of speed.  *Id*. at 8.  Officers pursued the motorcyclist, and a chase ensued.  *Id*.  Mr. Yoemans eventually crashed into a raised curb on a highway exit ramp.  *Id*. at 8.  His motorcycle was broken in half and he was ejected into traffic, where he was hit by an oncoming car.  *Id*. at 9.  Mr. Yoemans was severely injured.  He suffered a traumatic brain injury, and doctors placed him on a ventilator.  *Id*. at 9.  He was unable to talk when investigating officers arrived at the hospital.  *Id*.

Mr. Yoemans spent three months in the hospital.  He was finally cleared to be transferred to ACDF to await trial on September 23, 2016.  ECF No. 91 at 4.  On December 15, 2016 Mr. Yoemans was transferred to the Colorado Mental Health Institute in Pueblo to undergo a competency evaluation. *Id*.  On January 30, 2017 Mr. Yoemans was transferred back to ACDF.  *Id.* at 5.  Upon returning to

ACDF Mr. Yoemans was placed in general population and assigned to cell B-231, the same cell as Che Bachicha. *Id.*

**B. Events Leading Up to and Following Mr. Bachicha's Arrest**

On January 22, 2017 police were dispatched to 1075 North Pond Drive in Adams County, Colorado due to a suspected stabbing.  Upon arriving at the scene, police learned that Mr. Bachicha, his mother, and his stepfather were all sitting in the living room together waiting for a football game to start. ECF No. 91-4 at 4.  Mr. Bachicha left the room and went downstairs for a few minutes and came back with a homemade shank made out of a serrated steak knife with an approximately five-inch blade. *Id.* at 4.  Seemingly unprompted, he stood over his stepfather and began repeatedly stabbing him in the neck. *Id.*  He did not stop until his mother pleaded with him to give her the knife. *Id.*

When police arrived on scene, Mr. Bachicha's mother told them that her son had been acting strange and paranoid during the week leading up to the stabbing. *Id.*  She also informed officers that Mr. Bachicha had previously been diagnosed with bipolar disorder and post-traumatic stress disorder. *Id.* Mr. Bachicha had not taken his prescribed medication for these disorders for months. *Id.*  Mr. Bachicha was arrested for attempted murder based on this stabbing. *Id.*

**C. ACDF Operations, Protocols, and Placement Regarding Mr. Yoemans' and Mr. Bachicha's Housing**

1. Medical Services at the Jail

At the time of Mr. Yoemans' death, the ACDF did not have a separate mental health unit within the facility.  Instead, inmates who had been diagnosed with mental health disorders—or who were on suicide or homicide watch—were housed in the jail's infirmary aside patients dealing with physical ailments and infectious diseases.  ECF No. 91-7 at 82.  There were only five mental health cells in that mixed-use facility.  *Id.* at 83.  In 2012 Susan Argo, the Support Services Manager in the Adams County

3

Sheriff's Office's jail division, began noticing that more and more people with mental health conditions and disorders were being brought to the jail. ECF No. 91-13 at 32. Around that time the Sheriff's Office—under then-Sheriff Doug Darr—requested a budget increase for the purpose of building a separate mental health unit within the facility. *Id*. at 50. The Board of County Commissioners initially rejected that budget request. *Id*. The budget request was not approved until 2015—three years after the Sheriff's office initial request. *Id*.

At all times relevant to this case the Adams County Sheriff's Office contracted with two separate companies to provide medical services to the facility's inmates. Wellpath LLC provided inmates with medical care for their physical health. ECF No. 88-1 at 4. Wellpath LLC was also responsible for doing an initial medical screening as inmates came into the jail. ECF No. 91-12 at 32. Community Reach Center ("CRC") provided medical care for inmates' mental health. ECF No. 88-1 at 4. Because different providers were responsible for the inmates' physical and mental health, some infirmary employees reported communication breakdowns. Wellpath employees only had limited, if any, access to CRC mental health records. ECF No. 91-14 at 31; ECF No. 88-2 at 4. Entries by therapists and those who were not psychiatrists were not available to Wellpath LLC's employees. ECF No. 91-14 at 31.

### 2. The Matrix Consulting Report

In March 2015 the Adams County Sheriff's Office contracted with Matrix Consulting Group to provide them with a report on the staffing requirements of the jail division. *See* ECF No. 91-14. Matrix Consulting issued a 109-page report and made significant findings as to the adequacy of ACDF's staffing within the jail division. *Id*. The report provided both conclusions and recommendations. In reaching these, the consulting group did the following: interviewed county management staff and political leadership; interviewed the jail's managerial, supervisory, and line staff; toured the jail facility;

4

collected and reviewed data from a wide range of sources; and  reviewed key documents including program budgets, operating policies, and staffing documents.  ECF No. 91-14 at 4.

The report made several recommendations that have no bearing on this case.  However, one recommendation pertinent to this case was the need to add an additional court services specialist to classifications.  ECF No 91-14 at 7.  Additionally, the consulting group found that 93 percent of people surveyed did not believe the jail division operated with an appropriate number of staff; 90 percent did not believe the jail had an adequate number of staff to meet the requirements of the fixed post staffing plan; 84 percent did not believe they had sufficient staff to perform their jobs safely; and 77 percent did not believe ACDF had an adequate number of staff to ensure inmate safety."  ECF No. 81-14 at 30.

**D. ACDF's Classifications Unit and the Classifications of Mr. Bachicha and Mr. Yoemans**

At all times relevant to this case ACDF classified new inmates into different custody levels and pods within the jail.  According to ACDF's protocols, when a new male inmate arrived at the facility the booking deputies sent him to the jail's intake unit.  ECF No. 88-3 at 1.  New inmates usually remained in the intake facility for up to seventy-two hours while they awaited a more permanent housing assignment.  *Id*.  While inmates were in the intake unit, on-site jail deputies monitored the inmate's behavior and attitude.  *Id*.

The jail's classifications unit was within the Court Services Unit.  The Court Services Unit was responsible for a number of vital functions within the jail, including "classifications of inmates through use of an objective classification system, conducting pre-trial investigations of inmates, [and] performing jail review of housed inmates . . . ."  ECF No. 88-3 at 1.  Classifications specialists were primarily trained through on-the-job training—where a new hire shadowed a more senior employee— and received no mental-health-related training.

5

Classifications specialists interviewed incoming inmates, classified them according to the jail's classification system, and assigned them to a custody level based on each inmate's classification score. *Id.* Custody levels were divided into three categories: minimum, medium, and maximum security. *Id.* at 2. The purpose of classifying inmates was to ensure that inmates housed together had the same custody level designation. ECF No. 91-2 at 28. The jail's protocols also required the facility "to provide for the separate management of male and female inmates, special management inmates, [and] inmates requiring administrative or disciplinary segregation . . . ." ECF No. 88-3 at 2.

Christopher Campbell worked in the ACDF classifications unit. He classified both Mr. Bachicha and Mr. Yoemans as maximum-security inmates. ECF No. 88-6, 88-9. Mr. Campbell's primary duty as a classification specialist was to classify all newly arrested individuals that were coming into the jail. ECF No. 91-2 at 27. Mr. Campbell characterized the job as being fairly fast paced as he was required to classify approximately twenty to fifty individuals on any given day. ECF No. 91-2 at 33. While he was never disciplined for any of his job duties, his supervisors told him on multiple occasions that he needed to speed up his processing times so he could classify more inmates per day. ECF No 91-2 at 179-80.

The classifications process went as follows. Every evening the classification specialists prepared a classifications file for all inmates who had classifications interviews the following day. ECF No. 91-2 at 32. The file included documents like the inmate's custody sheet, arrest warrants, criminal history, and any NCIC or CBI information that was available, but it did not include arrest affidavits or mental or medical health records. ECF No. 91-2 at 40-41. The classifications specialists did not do any further research on inmates at the time the file was prepared for the next day's interviews. *Id*.

Next, the classifications specialists interviewed each inmate. ECF No. 91-2 at 43. They used a standardized form to assess each inmate on pre-determined categories. ECF No. 88-6, 88-9. Classification specialists rated each inmate on a numeric scale in the following areas: severity of current

6

charges and convictions, serious offense history, escape history, prior jail time, prior felony charges, disciplinary history, alcohol and drug use, and stability factors.  ECF No. 91-3 at 5.  The classification specialist also was required to check off "all special management concerns" that apply to each inmate, which include protective custody, psychological impairment, mental deficiency, escape risk, substance abuse problems, known gang affiliation, known management problems, physical impairment, and potential for violence.  *Id*. at 6.  Classification specialists relied on the form when interviewing inmates and asked them questions relating to each of the above-mentioned categories.

An inmate's score determined the custody level in which the inmate should be classified.  A score of zero to six is considered minimum security; seven to thirteen is medium security; and above fourteen is maximum security.  ECF No. 91-3 at 6; ECF No. 91-2 at 63.  However, another section on the form asked the classifications specialist to consider whether overriding the scaled score is recommended, and if so, to provide his or her reasoning for any override.  ECF No. 91-3 at 6.  *Id*. Further down, it said, "classification level assigned" and "rationale if different than recommendation." ECF No. 91-3 at 6.  When asked about this section of the form, Mr. Campbell stated he was trained to not fill out that part of the form and it had not been used in years.  ECF No. 91-2 at 64.

Defendant Campbell relied on the assessment form when conducting his interviews with both Mr. Bachicha and Mr. Yoemans.  He stated that he considered the interview process to be objective. ECF No. 91-2 at 47.  He admitted that during interviews he did not ask any questions beyond what was on the form.  *Id*. at 47.  Additionally, he stated that the interviews are not meant to assess an inmate's mental health.  *Id.* at 121.  In fact, he did not assess inmates' behavior or demeanor during interviews nor was he trained to assess such behavior.  Instead he said that his primary job was to ask the inmate about their criminal history and ensure the inmate's version matched up with the file.  *Id*. at 50.  After the interviews Mr. Campbell scored each inmate according to the form.  *Id*. at 49.

1. <u>Che Bachicha's Classification</u>

On January 24, 2017 Mr. Campbell classified Che Bachicha as a maximum-security inmate. ECF No. 88-9 at 1.  Mr. Campbell scored and classified Mr. Bachicha according to the classification assessment form.  *Id.*  He partially completed the form during the interview and completed the rest after the interview concluded.  ECF No. 91-2 at 75.  The interview lasted approximately five minutes.  *Id*. at 68.  Mr. Campbell considered the interview "mostly unremarkable" and said it was similar to all other interviews he had done up to that point.  *Id.* at 70.  He spoke with Mr. Bachicha briefly and then—to the extent he could—verified the information that Mr. Bachicha provided.  *Id*. at 75.

For severity of current charges, Mr. Campbell wrote "attempted murder" and scored Mr. Bachicha a seven—the highest possible score.  ECF No. 88-9 at 1.  For serious offense history, Mr. Campbell circled five—the second highest possible score—based on Mr. Bachicha's convictions for two escapes, menacing, and sexual assault on a child.  ECF No. 91-2 at 76-77.  For escape history, Mr. Campbell scored Mr. Bachicha a three due to previous escapes.  ECF No. 88-9.  Mr. Campbell scored Mr. Bachicha a five for prior jail time because he had more than twenty months of prior jail time.  ECF No. 91-2 at 79, 88-9 at 1.  For prior felonies charged, he circled four indicating that Mr. Bachicha had two or more prior felonies.  ECF No 88-9 at 1.  For disciplinary history, Mr. Bachicha scored the highest score of three for "one or more major disciplinary reports and disciplinary segregation."  *Id.*  Mr. Campbell assigned a score of zero to Mr. Bachicha's issues with drug and alcohol abuse.  ECF No 88-9 at 1.  Finally, Mr. Campbell subtracted two points from Mr. Bachicha's overall classification score for stability factors because he was older than twenty-five and had lived at the same address for the past twelve months.  *Id.*  Mr. Bachicha's total score was a twenty-five, placing him within the maximum-security custody level.

Mr. Campbell also checked off other special management factors that did not bear on Mr. Bachicha's assessment score.  These indicated that Mr. Bachicha had a psychological impairment, was an escape risk, was a known management problem, and that he was potentially violent.  ECF No. 88-9 at 2.  Mr. Campbell indicated that he checked "psychological impairment" because of something Mr. Bachicha self-reported but that he cannot access inmates' mental health history.  ECF No. 91-2 at 86.  Mr. Campbell indicated that he checked Mr. Bachicha off as potentially violent because he was arrested for attempted murder, but he also stated that he checked this off for nearly every inmate.  *Id.* at 88.  Mr. Campbell did not complete the area of the form that asked whether an override of the scaled score was recommended.  *Id*.  Upon completing the classification, Mr. Campbell knew that Mr. Bachicha would be in the jail's general population, housed with another inmate, and locked down with that inmate overnight.  ECF No. 91-12 at 130.

### 2. Mr. Yoemans' Classification

On September 25, 2016 Mr. Campbell scored Mr. Yoemans—like Mr. Bachicha—as a maximum-security inmate.  *See* ECF No. 88-6.  Mr. Campbell followed the process outlined above when he classified Mr. Yoemans.  However, because Mr. Yoemans had just been released from his three-month-long stay at the hospital, the interview took place in the medical ward of the jail.  ECF No. 91-2 at 117.  Mr. Campbell remembers Mr. Yoemans lying in a hospital bed throughout the interview and appearing injured—though he did not know the precise injuries Mr. Yoemans sustained.  *Id*. at 120.  During Mr. Yoemans' interview, it was not apparent to Mr. Campbell that he had any psychological impairments.  ECF No. 91-2 at 120.  However, he did have "some speaking issues due to his injuries."  ECF No. 91-2- at 120-121.  Mr. Campbell asked Mr. Yoemans the questions on the assessment form and acknowledged that his purpose was not to perform an in-depth assessment of his mental state.  Furthermore, Mr. Campbell stated that an inmate's physical health has no bearing on their classification

9

level.  ECF No. 91-2 at 122.  Physical health was simply not part of the classification specialist's calculus.  *Id.*

Mr. Campbell assigned Mr. Yoemans a total score of twenty-three—surpassing the maximum-security designation threshold.  ECF No. 88-6.  Mr. Yoemans scored a seven on severity of charges, a three on escape history, a five on prior jail time, a four on prior felonies, a zero on disciplinary history, and a one on alcohol and drug use.  *Id.*  Mr. Campbell subtracted two points from Mr. Yoemans' overall score for stability factors because he was over twenty-five and had lived at the same address for more than twelve months.  *Id.*  Mr. Campbell did not mark Mr. Yoemans as having any psychological impairment, mental deficiency, physical impairment, or a potential for violence.  *Id.*

## E. Jail Module Supervision on February 7, 2017 and Mr. Yoemans' Murder

After their respective classifications Mr. Bachicha and Mr. Yoemans were housed together in a single cell in the maximum-security area of the jail.  This area did not have direct supervision; i.e., deputies could not see all inmates at all times.  ECF No. 91-12 at 117.  Instead, the deputies would perform periodic row checks of inmates.  *Id.* at 120.  Row checks involved deputies walking up and down the module and peering inside the approximately twelve-inch window on the cell's door every thirty minutes or so.  *Id.* at 117-20.

At 12:04 am on February 7, 2017 a deputy did a row check of the module in which Mr. Bachicha and Mr. Yoemans were housed.  ECF No. 91-1 at 3.  When the deputy walked by, he observed both Mr. Yoemans and Mr. Bachicha sleeping in their beds.  *Id.*  The next row check was done at 12:33 am.  *Id.*  When the deputy peered through the small window on the cell door, he saw Mr. Yoemans lying face down on the cell floor with a pool of blood surrounding his head.  *Id.*  Mr. Yoemans had a large laceration on his forehead that was deep enough to show his skull.  ECF No. 91-1 at 3.  Mr. Bachicha had scratches and marks on his back indicating that Mr. Yoemans had attempted to defend himself.  A

10

deputy also observed that Mr. Bachicha walked with a limp in the early morning hours on February 7, 2017—a limp he had not had before. *Id.* Mr. Yoemans was transported to the Platte Valley Medical Center and was pronounced dead at 2:38 a.m. *Id.*

After deputies found Mr. Yoemans dead in his cell, they interviewed inmates housed in nearby cells to piece together what happened. Manuel Saenz-Cordona, who was housed in the cell directly to the left, reported hearing a loud pounding sound begin around midnight. ECF No. 91-1 at 2. When talking with officers, he mimicked the sound he heard by banging his hands on the wall and stomping his feet. *Id.* He said this sound lasted for approximately ten minutes. Heath Kinsey, the inmate housed directly above Mr. Bachicha and Mr. Yoemans, stated that he was awakened by a loud banging noise from the cell below him. *Id.* He estimated that the banging continued for fifteen to thirty minutes. *Id.* Other inmates denied hearing anything. At no time did any of the on-duty deputies report hearing any noise coming from the cell Mr. Bachicha and Mr. Yoemans shared. *Id.*

## II. PROCEDURAL BACKGROUND

Plaintiffs filed their initial complaint and jury demand on January 29, 2019. ECF No. 1. The case was initially assigned to Magistrate Judge Wang. ECF No. 2. All parties did not consent to the magistrate judge assignment, and the case was reassigned to this Court. ECF No. 28. Defendants filed their answer to the initial complaint on April 8, 2019. ECF No. 33, 34. On May 13, 2019 plaintiffs filed an amended complaint and jury demand. ECF No. 43. On May 28, 2019 defendants Janice Marshall and Wellpath, LLC filed their answer to the amended complaint. ECF No. 48 The remaining defendants filed their answer on June 3, 2019. ECF No. 49. On June 11, 2019 defendant Ayala was dismissed as a party pursuant to a joint motion filed by the parties. ECF No. 51.

On October 22, 2019 the Court granted plaintiffs' motion for leave to further amend their complaint. ECF No. 60. The plaintiffs filed their second amended complaint on the same day. ECF

No. 61.  All defendants filed their answers on November 4, 2019.  ECF No. 62, 63.  On April 9, 2020

plaintiffs filed a notice of voluntary dismissal of the following parties from the lawsuit: Gary Brown,

Daniel Gilbert, Ross Yniguez, and Joseph Fischer.  ECF No. 86.  On May 14, 2020 defendants

Wellpath, LLC and Janice Marshall were dismissed as parties.  ECF No. 87.  Accordingly, the wrongful

death claim—brought against only Marshall and Wellpath, LLC—was dismissed at that time.

On June 15, 2020 the remaining defendants filed a motion for summary judgment.  ECF No. 88.

Plaintiffs filed their response—after receiving leave to file excess pages—on July 6, 2020.  ECF No. 91.

Defendants filed their reply on July 20, 2020.  ECF No. 93.  The matter is now ripe.

## III. STANDARD OF REVIEW

A court may grant summary judgment if "there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  The moving party has

the burden to show that there is an absence of evidence to support the nonmoving party's case.  *See*

*Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  The nonmoving party must "designate specific facts

showing that there is a genuine issue for trial."  *Id.* at 324.  A fact is material "if under the substantive

law it is essential to the proper disposition of the claim."  *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664,

670 (10th Cir. 1998) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A material fact

is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving

party."  *Anderson*, 477 U.S. at 248.  The court will examine the factual record and make reasonable

inferences in the light most favorable to the party opposing summary judgment.  *See Concrete Works of*

*Colo., Inc. v. City and Cty. of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994).

## IV. ANALYSIS

Three claims remain from plaintiffs' second amended complaint: (1) a § 1983 claim against

defendant Campbell for alleged Fourteenth Amendment violations, (2) a supervisory liability claim

against defendant McIntosh in his individual capacity under § 1983 for alleged Fourteenth Amendment violations, and (3) a *Monell* liability claim against the county defendants under § 1983 for alleged Fourteenth Amendment violations.  ECF No. 61 at 55.

Defendants move for summary judgment as to each of the three claims.  Defendants Campbell and McIntosh argue that they are entitled to qualified immunity as to claims one and two.  Defendants Reigenborn and the county commissioners argue that they are entitled to judgment as a matter of law as to claim three because plaintiffs have not sufficiently demonstrated municipal liability.  I address each argument below.

**A. <u>Qualified Immunity as to Defendant Campbell and Claim One</u>**

Plaintiffs assert that defendant Campbell violated Mr. Yoemans' Fourteenth Amendment rights by acting with deliberate indifference to his safety and by disregarding excessive risks arising from his conditions of confinement that could cause him serious harm.  ECF No. 61 at 50.  Defendants argue that defendant Campbell is qualifiedly immune from liability.  ECF No. 88 at 7.

Qualified immunity protects government officials acting in their individual capacity so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  When qualified immunity is asserted by an official, a plaintiff must satisfy the burden of showing (1) that the defendant violated a constitutional right (2) that was clearly established at the time of the violation.  *See Pearson v. Callahan,* 555 U.S. 223, 232 (2009).  A reviewing court has discretion to address either prong first.  *See Cox v. Glanz,* 800 F.3d 1231, 1247 (10th Cir. 2015).  I begin with whether defendant Campbell violated Mr. Yoemans' constitutional rights under the Fourteenth Amendment.

1. <u>Whether Defendant Campbell Violated a Constitutional Right</u>

13

The Eighth Amendment's protections apply to pretrial detainees through the due process clause of the Fourteenth Amendment. *Bell v. Wolfish*, 441 U.S. 520, n. 16. (citing *U.S. v. Lovett,* 328 U.S. 303, 317-18) ("Eighth Amendment scrutiny is appropriate only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions."). When a plaintiff "finds himself in the criminal justice system . . . between the two stools of an initial seizure and post-conviction punishment, we turn to the due process clause . . . of the Fourteenth Amendment and [its] protection against arbitrary governmental action by federal or state authorities to evaluate claims of mistreatment. *Colbruno v. Kessler*, 928 F.3d 1155, 1162 (10th Cir. 2019) (quoting *Porro v. Barnes*, 624 F.3d 1322, 1326 (10th Cir. 2010)).

The Eighth Amendment prohibits the infliction of cruel and unusual punishment on persons convicted of crimes. *Wilson v. Seiter*, 501 U.S. 294, 296-97 (1991). Specifically, the Eighth Amendment protects against "unjustifiable conditions of confinement" and imposes duties on officials "who must . . . take reasonable measures to guarantee the safety of inmates." *Farmer v. Brennan*, 511 U.S. 825, 832 (citing *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)). To establish that a condition of confinement constitutes cruel and unusual punishment, an inmate must show both an objective component and a subjective component. *Id.* The objective component requires evidence that the constitutional deprivation is sufficiently serious, while the subjective component requires evidence that the defendant acted with a culpable state of mind (i.e. some form of wanton conduct amounting to at least deliberate indifference as compared to inadvertence or good faith error). *Wilson v. Seiter*, 501 U.S. 294, 298-304.

a. Kinglsey and Whether the Subjective Component Applies to Plaintiffs' Claim

The question is whether plaintiffs' case is the type that requires proving both the subjective and objective components, or only the objective component. Plaintiffs argue that this court need only apply

14

the objective component based on Mr. Yoemans' status as a pretrial detainee.  ECF No. 91 at 28.  In

*Kingsley v. Hendrickson*, the Supreme Court held that a pretrial detainee must show only that the force

used against him was objectively unreasonable to prevail on an excessive force claim.  576 U.S. 389,

396-97 (2015).  "This determination must be made from the perspective of a reasonable officer on the

scene, including what the officer knew at the time. . . ." *Id.* at 397 (quoting *Graham v. Connor*, 490 U.S.

386, 396 (1989)).  The Tenth Circuit, relying on *Kingsley*, similarly held that "there is no subjective

element of an excessive force claim brought by a pretrial detainee."  *Colbruno v. Kessler*, 928 F. 3d

1155, 1163 (10th Cir. 2019).

I agree that *Kingsley* and its progeny ease the burden on pretrial detainees bringing excessive

force claims under the due process clause of the Fourteenth Amendment; however, I am unconvinced

that either *Kingsley* or *Colbruno* apply to this case.  While both excessive force and deliberate

indifference claims typically require plaintiffs to establish both an objective and subjective component,

the standard for the subjective component differs between the two claims.  The subjective component in

an excessive force claim requires plaintiffs to demonstrate that the officer was not acting in a "good faith

effort to restore discipline" but instead acted "maliciously and sadistically for the very purpose of

causing harm."  *Redmond v. Crowther,* 882 F.3d 927, 936 (10th Cir. 2018) (quoting *Whitley v. Albers*,

475 U.S. 312, 320 (1986)).  Meanwhile, under a deliberate indifference analysis, the Court is not asking

whether the officer intended to punish the individual by his actions.  Instead, the Court considers

whether the official consciously disregarded a substantial risk of serious harm.  *Self v. Crum*, 429 F.3d

1227, 1231 (10th Cir. 2006) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).

While the difference between the two standards may be slight, the subjective component of a

deliberate indifference claim is akin to recklessness in the criminal law, while the subjective component

of an excessive force claim requires a showing of maliciousness.  Therefore, the standards between the

two claims are distinguishable.  Plaintiffs are alleging a deliberate indifference case against defendant Campbell and therefore must show recklessness as opposed to maliciousness.  Extending *Kingsley* to the deliberate indifference context is thus improper.  I therefore address both the subjective and objective components of plaintiffs' deliberate indifference claim against defendant Campbell.

### b. Objective Component

To satsify the objective component of an Eighth Amendment failure-to-protect claim, a plaintiff must show that "he is incarcerated under conditions posing a substantial risk of serious harm." *Benefield v. McDowall*, 241 F.3d 1267 (citing *Farmer*, 241 F.3d 1267 (2001)).  Defendants argue that the objective component has not been satisfied.  ECF No. 88 at 8.  In other words, they argue that plaintiffs have failed to establish that Mr. Yoemans was at risk of being seriously harmed even though he was murdered by his cellmate.  ECF No. 88 at 9.  They argue that some level of violence is always expected when dealing with dangerous criminals.  *Id.*

Defendants also argue there was parity between Mr. Yoemans and Mr. Bachicha without discussing how any alleged parity between the two men is relevant to the Court's analysis.  *Id.* at 10.  By parity they mean that Mr. Bachicha and Mr. Yoemans were both accused of attempted murder, both cleared by medical professionals, and both received a maximum-security score on their classification assessment.  *Id.*  However, defendants' parity argument is unconvincing because they fail to mention that Mr. Yoemans was in a serious motorcycle accident resulting in a traumatic brain injury and transported to the Colorado Mental Health Institute in Pueblo to undergo a competency evaluation.  Furthermore, because of Mr. Yoemans' extended hospitalization, by the time Mr. Yoemans and Mr. Bachicha were housed together, nearly six months had elapsed since Mr. Yoemans' arrest.  Meanwhile, Mr. Bachicha was arrested for attempted murder fourteen days prior to murdering Mr. Yoemans.

16

Therefore, due to the numerous differences between Mr. Bachicha's and Mr. Yoemans' situations, defendants' parity argument is unhelpful to the Court's objective component analysis.

To satisfy the objective component, plaintiffs must "produce objective evidence that the deprivation at issue was in fact 'sufficiently serious.'" *Mata v. Saiz,* 427 F.3d 745, 751 (10th Cir. 2005) (quoting *Farmer*, 511 U.S. at 825). Death is ". . .without doubt, sufficiently serious to meet the objective component necessary to implicate the Fourteenth Amendment." *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009). Mr. Yoemans was violently murdered in his cell by his cellmate merely weeks after returning to ACDF from the Colorado Mental Health Institute. The objective component has therefore been satisfied as to plaintiffs' Fourteenth Amendment deliberate indifference claim against defendant Campbell.

c. Subjective Component

Under the subjective component, plaintiffs must demonstrate that the prison official had a "sufficiently culpable state of mind" when committing the constitutional violation. *Oxendine v. Kaplan*, 241 F.3d at 1274. The subjective standard requires a state of mind "akin to recklessness in the criminal law, where, to act recklessly, a person must consciously disregard a substantial risk of serious harm." *Self*, 429 F.3d at 1231 (quoting *Farmer*, 511 U.S. at 837). While plaintiffs bear the burden of establishing that prison officials had a sufficiently culpable state of mind, there is no requirement that defendants have the "express intent to harm" plaintiff. *Mitchell v. Maynard,* 80 F.3d 1422, 1442 (10th Cir. 1996). Further, plaintiffs are not required to "show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of harm." *Farmer,* 511 U.S. at 842

Plaintiffs can satisfy the subjective component if they prove that the prison official had knowledge of an excessive risk to inmate health or safety and disregarded that risk. *Mata*, 427 F.3d at

17

752.  "The official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and [the official] must also draw that inference."  *Farmer*, 511 U.S. at 837.  Determining whether a defendant possessed actual knowledge of the substantial risk of harm is a question of fact and can be proven in the usual ways, including by circumstantial evidence.  *Id.*

Defendants argue that plaintiffs have failed to satisfy the subjective component because defendant Campbell did not know that his classifying Mr. Bachicha for general population would put Mr. Yoemans specifically at risk of serious harm.  ECF No. 88 at 10.  Plaintiffs argue that they are not required to prove that Campbell knew of a specific risk to Mr. Yoemans, but instead must only show defendant Campbell knew generally that anyone assigned to Mr. Bachicha's cell was at risk of serious harm.  I agree with plaintiffs that *Farmer* is clear on this issue.  The *Farmer* court states

> [n]or may a prison official escape liability for deliberate indifference by showing that, while he was aware of an obvious, substantial risk to inmate safety, he did not know that the complainant was especially likely to be assaulted . . . . it does not matter . . . whether a prisoner faces an excessive risk of harm for reasons personal to him or because all prisoners in his situation face such a risk.

511 U.S. at 843.

Here, a genuine dispute exists as to whether defendant Campbell knew that classifying Bachicha as maximum security—and thereby placing him in general population—would create a substantial risk of serious harm to the safety of other inmates, including to Mr. Yoemans.  In his deposition, defendant Campbell admitted that he reviewed Mr. Bachicha's criminal history and his ACDF disciplinary history.  ECF No. 91-2 at 72-6;  *see also* ECF No. 88-9.  He also knew the crimes of which he was accused, and that Mr. Bachicha had been disciplined within ACDF and placed in administrative segregation on prior occasions.  ECF No. 91-2 at 80.  Additionally, upon reviewing all of these pieces of information—and conducting a five-minute interview with Mr. Bachicha—defendant Campbell admitted that he thought Mr. Bachicha had a potential for violence, something he did not believe of Mr. Yoemans.  *See* ECF No.

18

88-6, 88-9.  Therefore, while defendant Campbell did not know that Mr. Bachicha would be housed with Mr. Yoemans specifically, a reasonable jury could infer that Campbell knew whomever was housed with Mr. Bachicha was at risk of being seriously harmed.

Defendants further argue that defendant Campbell did not have the requisite state of mind because there were no other options available to him other than classifying Mr. Bachicha as maximum security.  According to defendants, defendant Campbell's only job was to fill out the pre-prepared assessment sheet, score each inmate objectively, and categorize the inmates according to their score. ECF No. 93 at 2.  However, Campbell admitted that he was trained to "go up the chain of command" if he was concerned about an inmate's potential for violence, or he could alert a deputy who had the authority to place an inmate in administrative segregation.  ECF No. 91-2 at 67-8.  Furthermore, Campbell stated that the administrative segregation process involves the classifications unit, and that he frequently participated in segregation meetings.  *Id.* at 74.

It is reasonable to infer that because defendant Campbell participated in the segregation meetings, he knew he could ask to have Mr. Bachicha placed in segregation instead of in general population due to his risk of violence.  Accordingly, a reasonable jury could find that defendant Campbell acted with a sufficiently culpable of mind; i.e., that he consciously disregarded a known risk of harm when he acknowledged Mr. Bachicha's potential for violence and nonetheless recommended that he be placed in general population without taking any additional steps such as "going up the chain of command" or alerting a deputy to trigger the segregation process.

2. Whether the Right at Issue was Clearly Established

A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right.  *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (citing *Reichle v. Howards*, 566 U.S. 658, 664 (2012)) (internal quotations omitted).  "A plaintiff may

show clearly established law by pointing to either a Supreme Court or Tenth Circuit decision, or the weight of authority from other courts existing at the time of the alleged violation." *Ali v. Duboise*, 763 Fed. App'x. 645, 650 (10th Cir. 2019) (unpublished) (citing *T.D. v. Patton*, 868 F.3d 1209, 1220 (10th Cir. 2017)) (internal quotations omitted).  Clearly established law should not be defined at a high level of generality.  *White v. Pauly*, 137 S.Ct. 548, 552 (2017) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)) (internal quotations omitted).  "Although a plaintiff need not identify a case directly on point, existing precedent must have placed the statutory or constitutional question beyond debate."  *Ali*, 763 F. App'x at 650 (citing *Mullenix*, 577 U.S. at 12) (internal quotations omitted); see also *White*, 137 S.Ct. at 551.

Defendants argue that defendant Campbell is entitled to judgment as a matter of law because the right at issue was not clearly established.  *Roemer* is a District of Colorado case in which an inmate at the Sterling Correctional Facility was killed by his cellmate, who was known to be a dangerous individual.  *Roemer v. Carochi*, No. 1-14-cv-01655-PAB-NYW, 2019 WL5728769 (D. Colo. 2015).  Defendants argue that *Roemer*—a district court decision—is distinguishable and could not have put defendant Campbell on notice that his actions violated Mr. Yoemans' constitutional rights.  ECF No. 88 at 13.  Plaintiffs rightly point out it is not *Roemer* that clearly establishes the right at issue but instead *Farmer v. Brennan*.  *Farmer* is a landmark civil rights case that defines the standard for deliberate indifference and puts officials on notice regarding their duty to protect prisoners—particularly vulnerable ones—from attack by other prisoners.  *Farmer*, 511 U.S. at 833.

Prisoners are in a uniquely precarious situation because they must rely on others to keep them safe and to provide them with adequate care.  An incarcerated individual has been "stripped . .  of virtually every means of self-protection," and "the government and its officials are not free to let the state of nature take its course."  *Id*.  "As the lower courts have uniformly held . . . 'prison officials have

a duty . . . to protect prisoners from violence at the hands of other prisoners." *Id.* (quoting *Wilson v. Seiter*, 401 U.S. at 303.)  Therefore, defendant Campbell had a duty to protect prisoners from Mr. Bachicha.

In addition to *Farmer,* plaintiffs point to numerous other cases that establish that prison officials have an affirmative duty to reasonably protect incarcerated individuals from potentially dangerous inmates in their housing placements.  One such case is *Berry v. City of Muskogee, Okl.*, a case where a widow sued the city after her husband was murdered by other inmates while incarcerated.  900 F.2d 1489 (10th Cir. 1990).  There, the prison's lack of a classification system resulted in the husband's being housed alongside his co-defendants who he had implicated in the crime.  *Id.* at 1497.  While *Berry* involved municipal liability—unlike the individual liability claim at issue here—it nevertheless indicates that  officials have a constitutional duty to take reasonable steps to protect prisoners' safety and bodily integrity via a classifications process.  *Id.*  This is so even if no city or official can *guarantee* the safety of each of its prisoners.  *Id*. at 1499 ("The City, of course, cannot absolutely guarantee the safety of its prisoners, but it has a constitutional duty to take reasonable steps to protect the prisoners' safety and bodily integrity.").

While defendants are correct that *Roemer v. Carochi* on its own is insufficient to clearly establish a right, *Roemer* persuasively shows that other courts have found that the right at issue is clearly established.  The *Roemer* court denied qualified immunity to a classifications official who placed an inmate with a known potential for violence in general population where he went onto kill his cellmate.  *Roemer*, No. 1-14-cv-01655-PAB-NYW, 2019 WL 5728769 at *13 (D. Colo. 2015).  Chief Judge Brimmer denied qualified immunity on the following grounds:

> [i]t is well established that an inmate has a right to be protected from substantial risks of assault at the hands of prisoners. . . . Although *Farmer* does not, in all cases, settle every question with respect to prison officials who fail to prevent an assault. . .  here, *Farmer* and its progeny make

> sufficiently clear that a reasonable officer . . . would have known that by placing [the inmate] in general population, [and] thereby disregarding his violent history . . . he was subjecting his cellmate to an unreasonable risk of assault in violation of the Eighth Amendment.

*Id.* (citing *Farmer*, 511 U.S. at 833-34; *Ramos v. Lamm*, 639 F.2d.559, 572 (10th Cir. 1980)); *Howard v. Waide,* 534 F.3d 1227, 1242 (10th Cir. 2008). I find the court's analysis in *Roemer* applicable here. To put it in the *Roemer* court's words, a reasonable jury could find that defendant Campbell knew that by placing Mr. Bachicha "in general population, [and] thereby disregarding his violent history . . . he was subjecting his cellmate to an unreasonable risk of assault . . . ." *Roemer*, No. 1-14-cv-01655-PAB-NYW, 2019 WL 5728769 at *13 (D. Colo. 2015).

　　*Roemer, Berry, Ramos,* and *Howard* lends support to the conclusion that the right is clearly established. Accordingly, defendants' motion for summary judgment is DENIED as to defendant Campbell.

## B. Qualified Immunity as to Plaintiffs' Supervisory Liability Claim against Defendant McIntosh

　　Defendants argue that defendant McIntosh is entitled to qualified immunity because plaintiffs have failed to establish a constitutional deprivation. They contend that, as a result, plaintiffs' supervisory liability claim must fail as a matter of law. I disagree.

### 1. Supervisory Liability Claim

　　Plaintiffs argue that defendant McIntosh is liable under § 1983's supervisory liability theory. ECF No. 61 at 53. Defendants argue for judgment as a matter of law on the ground that plaintiffs have failed to sufficiently demonstrate causation. ECF No. 88 at 14. Defendants specifically argue that plaintiffs have not shown that any of defendant McIntosh's policies caused Mr. Yoemans' death. Defendants further argue that plaintiffs conflate supervisory liability with respondeat superior liability. I am unpersuaded by both of defendants' arguments.

To survive summary judgment under § 1983's supervisory liability theory, there must be a genuine dispute as to whether the defendant-supervisor personally participated in the alleged constitutional violation. "Individual liability under § 1983 must be based on personal involvement in the alleged constitutional violation." *Foote v. Spiegel,* 118 F.3d 1416, 1423 (10th Cir. 1997). In other words, there must be an "affirmative link" between the alleged violation and defendant McIntosh's conduct. *Stidham v. Peace Officer Standards & Training,* 265 F.3d 1144, 1157 (10th Cir. 1991). Individuals cannot be held liable under § 1983 on the basis of supervisory status alone. *Duffield v. Jackson,* 545 F.3d 1234, 1239 (10th Cir. 2008).

Defendants are correct that supervisory liability under § 1983 is distinguishable from a respondeat superior theory of liability. The threshold of proof for supervisory liability is higher than the tort doctrine of respondeat superior. When an official is sued on the basis of his supervisory status and policy-making authority, a plaintiff may establish the affirmative link by demonstrating that the defendant: "(1) promulgated, created, implemented or possessed responsibility for the continued operation of a policy, (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation." *Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010) (citing *Summum v. City of Ogden*, 297 F.3d 995, 1000 (10th Cir. 2002)). I analyze each of the *Dodds* factors below.

      a. <u>Possession, Implementation, or Responsibility for Continued Operation of Policy</u>

There is no question that plaintiffs have satisfied the first *Dodds* factor. McIntosh admitted that as Sheriff he was responsible for what happened within the jail facility. ECF 91-12 at 28. He stated that the "buck stopped with safety and security" and that ensuring safety within the facility was his responsibility. *Id.* While plaintiffs do not point to a policy that defendant McIntosh personally created

23

that resulted in Mr. Yoemans' death, the law does not require such a showing.  The first *Dodds* factor

can be satisfied when the defendant-supervisor did not create the policy but instead "possessed

responsibility for the continued operation of a policy."  *Dodds,* 614 F.3d at 1199.

  Here, McIntosh was the official responsible for the jail facility and for its policies and protocols.

His responsibilities included knowing the options staff had in placing inmates, the number of staff who

were working at any given time, the supervision tactics staff used to ensure inmate safety, and the

adequacy of the medical and mental health care provided to inmates.  Therefore, the first *Dodds* factor

has been satisfied based on defendant McIntosh's policy-making authority.

    b. <u>Did the Policy Cause Constitutional Harm?</u>

  Defendants next argue that Sheriff McIntosh's "involvement in the classification, housing, and

supervision of Yoemans is simply too tenuous to support a claim for liability."  ECF No. 88 at 15.

Plaintiffs counter that there is a causal connection between McIntosh's inaction and the policies that

resulted in Mr. Bachicha's placement in general population where he ultimately killed Mr. Yoemans.

ECF No. 91 at 13.

  "A plaintiff must establish the requisite causal connection by showing the defendant set in

motion a series of events that the defendant knew or reasonably should have known would cause others

to deprive the plaintiff of her constitutional rights.  *Schneider v. City of Grand Junction Police Dept.*,

717 F.3d 760, 768 (10th Cir. 2013) (citing *Dodds,* 614 F.3d at 1195-96).  In *Keith* the Tenth Circuit

acknowledged that a "supervision official's management actions may be sufficient to establish

causation."  *Keith v. Koerner*, 843 F.3d 833, 847 (10th Cir. 2016).  The court went on to say that "a jury

question exists as to whether [the defendant] was personally involved in the violation of [plaintiffs']

rights based on his . . . management practices."  *Id.*

Plaintiffs point to a number of McIntosh's management actions—or failures to act—that could establish causation.  They argue that McIntosh took no remedial action as he "repeatedly learned of risks to inmates in 2015-2016."  ECF No. 91 at 38.  Plaintiffs further argue that McIntosh did nothing when he learned "the jail suffered over 100 reported assaults yearly, when multiple inmates died relating to a lack of supervision, when a majority of employees reported unsafe conditions in the facility, and when the facility lacked a mental health unit.  *Id.*  Finally, plaintiffs point to policies that did not "require segregation of violent inmates like Bachicha upon their entry into the facility," "did not require (or even appear to allow) direct supervision of violent inmates," and "did not allow single-celling or separate housing for violent inmates despite having mothballed wings of the jail and empty cells."  ECF No. 91 at 38.

When viewing the evidence in the light most favorable to plaintiff—as the Court is required to do—it is reasonable to infer that McIntosh's management decisions caused Mr. Yoemans' constitutional deprivation.  As in *Keith*, a jury question exists as to whether defendant McIntosh's policies and management decisions caused Mr. Yoemans' death.  Thus, a genuine dispute exists as to causation under the second *Dodds* element.

### c. Did Defendant McIntosh Act with the Requisite State of Mind?

The third element of a supervisory liability claim requires a plaintiff to establish that the defendant-supervisor had the requisite state of mind.  A defendant-supervisor must have knowledge of a substantial risk of harm and must disregard that risk.  Defendants argue that plaintiff must demonstrate that defendant McIntosh knew that Mr. Bachicha posed a serious risk of harm specifically to Mr. Yoemans.  As discussed in Part IV.A.1.c. of this order, whether defendant McIntosh knew that Mr. Yoemans specifically was at risk of harm is inapposite.  Instead, the question is whether defendant McIntosh was aware that inmates generally were at risk of being harmed and disregarded that risk.

In *Lopez v. LeMaster*, a plaintiff overcame summary judgment against a sheriff on similar facts. There, the jail inspection division issued two reports that noted "deficiencies in staff and back up, training, and supervision of inmates at the jail." 172 F.3d at 761. When analyzing whether the defendant had the requisite state of mind the court considered a report from the jail inspection division following a suicide within the jail. The sheriff admitted in the report that "he was aware of the deficiencies in staffing, and surveillance at the jail." *Id.* at 762. The *Lopez* court stated,

> this admission provides evidence that Sheriff LeMaster was aware of the risk of harm to inmates resulting from inadequate supervision, and failed to take reasonable steps to prevent it . . . . We conclude that appellant supplied sufficient evidence to survive summary judgment on his claim against Sheriff LeMaster . . . .

*Id., abrogated on other grounds by Brown v. Flowers*, 974 F.3d 1178 (10th Cir. 2020).

Here Sheriff McIntosh also knew of staffing and surveillance inadequacies within the jail that could result in unsafe conditions. First, he was aware of the Matrix Consulting Report. ECF no. 91-12 at 96. The report found that ninety-three percent of jail staff believed that the facility was understaffed; eighty-four percent did not believe the jail had sufficient staff to perform their job safely; and seventy-seven percent of staff did not believe ACDF had an adequate number of staff to ensure inmate safety. *See* ECF No. 91-14.

Defendants argue that "[t]he purpose of this study was not to evaluate safety within ACDF but instead was to determine what staffing levels were needed for budgetary purposes." ECF No. 93 at 5. Defendants further argue that the employees' anonymous responses to the surveys are unreliable because the fact that "employees, who were being forced to take on overtime shifts due to staffing vacancies, reported the staffing levels were too low is not surprising." ECF No. 93 at 5. Regardless of its purpose, the report concluded that a majority of employees (1) felt unsafe while performing their jobs, and (2) did not believe staffing levels were adequate to ensure inmate safety. It seems that the

quality and reliability the report's findings are in dispute.  Thus, a genuine dispute exists as to whether the report would have put McIntosh on notice of a potential risk of harm to inmates.

Second, defendant McIntosh was aware that the maximum-security pod was not under an increased level of supervision and in fact was less supervised than lower security areas of the facility. ECF No. 91-12 at 52-53.  McIntosh knew there were blind spots where neither deputies nor the detention specialist could see inmates.  While defendants argue that the maximum-security area of the jail provided adequate supervision to inmates, plaintiffs argue the supervision was inadequate because there was no direct supervision of inmates—specifically, there was no supervision of the most violent inmates.  In reaching his opinion that defendant McIntosh's behavior constituted deliberate indifference, plaintiffs' expert states that defendant McIntosh knew there was a "serious security problem in the jail" because ACDF "did not utilize direct supervision and had blind spots within the maximum-security area."  ECF No. 91-11 at 10.  Thus, a genuine dispute of material fact exists as to whether ACDF's security was adequate for ensuring inmate safety.

Finally, McIntosh knew that in 2015 four deaths occurred within his facility during a three-month period.  ECF No. 91-12 at 125-134.  Three inmates died of suicide and one died of dehydration. *Id.*  When asked by press about the increase in deaths at his facility, he stated that "[i]f someone is determined to take their own life, when they get to that point, then they are going to do whatever it is that they need to do to make sure they are successful. . . . We can't put 1,000 inmates on suicide watch." ECF No. 91-12 at 136.  McIntosh also knew that inmate-on-inmate assaults were common and stated that it was an inevitability within the jail.  *Id.*  When asked about inmate-on-inmate violence he stated

> [s]o is it my role to prevent something from happening? . . . it's not my role and my responsibility. It's nice when we can do that but there's . . . no way that I can . . . prevent violence, there's no way that I can prevent death, without having a police officer posted everywhere 24 hours a day, seven days a week.

*Id.*

27

Plaintiffs have presented evidence to support the inference that defendant McIntosh was aware of a serious risk of harm and consciously disregarded that risk.  Plaintiffs have thus alleged sufficient evidence to survive summary judgment as to the third *Dodds* element.

### 2. Clearly Established Law

Qualified immunity is a defense that defendants must raise for it to be considered by the Court. Defendants assert that defendant McIntosh is qualifiedly immune from liability by stating that plaintiffs fail "to establish facts sufficient to support their claim  . . . . as such, there is no constitutional violation and Sheriff McIntosh is entitled to qualified immunity."  ECF No. 88 at 15.  Defendants make no reference to the clearly established prong of the qualified immunity analysis with respect to defendant McIntosh.  In their response plaintiffs argue that defendants waived the clearly established prong of qualified immunity.  Defendants do not address this assertion in their reply.  This Court has previously not addressed the qualified immunity defense when defendants only raise the issue without more.  *See Tillmon* v. County of Douglas, No. 18-cv-00492-RBJ-KLM, 2019 WL 1375678 (D. Colo. 2019), *aff'd by Tillmon v. Douglas County*, 817 Fed. Appx. 586 (10th Cir. 2020).  There, this Court reasoned

> [d]efendants offer no law to support their position that [they] are entitled to qualified immunity. . . . They offer no arguments and no law to the point of whether a reasonable official in the position of defendants would have been aware that their alleged conduct constituted a constitutional violation for each claim.  It seems that defendants only raise the issue of qualitied immunity to preserve it from waiver.

*Id*. at *12.

Therefore, because defendants' motion states that defendant McIntosh is entitled to qualified immunity without discussing whether the right at issue was clearly established, I find that defendants have waived the issue.  Therefore, because the Court found that a reasonable jury could find in favor of plaintiffs on the supervisory liability claim, defendants' motion for summary judgment as to defendant McIntosh is DENIED.

## C. *Monell* Liability Against Defendants Reigenborn and Adams County Commissioners

Plaintiffs' final claim alleges that the county defendants are liable under § 1983 "for maintaining deliberately indifferent policies, customs, procedures, decision-making, and training that resulted in the violation of Mr. Yoemans' Fourteenth Amendment due process rights, including his right to be protected and kept safe." ECF No. 61 at 56.  In their motion, defendants argue that plaintiffs have not provided enough evidence to support the factual elements necessary to support a claim for municipal liability. ECF No. 88 at 15.

A municipality can be liable when "the municipality itself causes the constitutional violation at issue." *City of Canton, Ohio v. Harris,* 489 U.S. 378, 385 (1989).  "It is only when the execution of the government's policy or custom inflicts the injury that the municipality may be held liable under § 1983." *Id* (internal quotations omitted).  The first question a court must answer when a plaintiff alleges municipal liability is "whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *Id.* at 385 (1989).  To establish causation a plaintiff must show that "(1) a municipal employee committed a constitutional violation, and (2) a municipal policy or custom was the moving force behind the constitutional deprivation." *Myers v. Okla. Cty. Bd. of Cty. Comm'rs*, 151 F.3d 1313, 1316 (10th Cir. 1998); *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978) (establishing that local governmental units are "persons" subject to § 1983 liability).

Here, defendants only argue that plaintiffs have failed to establish causation.  Additionally, in Parts IV.A.1 and IV.B.1 of this order, the Court found that plaintiffs presented sufficient evidence to survive summary judgment as to whether defendants Campbell and McIntosh committed constitutional violations.  I therefore only address whether a municipal policy or custom was the moving force behind Mr. Yoemans' alleged constitutional deprivation.

29

1. Was a Municipal Policy or Custom the Moving Force Behind the Alleged
   Constitutional Deprivation?

Defendants argue that plaintiffs' municipal liability claim must fail because they have not

demonstrated "a pattern or practice of inmate on inmate deaths caused by an alleged misclassification of

inmates." ECF No. 88 at 16. They cite no law to support their conclusion that such specificity is

required. While plaintiffs admittedly do not show a pattern or practice of inmates being murdered by

their cellmates, they do cite several of the county's policies and practices that they allege "were the

moving force" that caused the constitutional violation, including: (1) housing violent, dangerous,

mentally unstable detainees like Bachicha in general population; (2) housing violent, dangerous,

mentally unstable detainees with vulnerable detainees, (3) having blind spots and inadequate supervision

in the so-called maximum security area of the jail, (4) not providing sufficient funding for safer housing

and supervision of inmates, (5) failing to adequately train and supervise defendant Campbell to alert

supervisors regarding dangerous and potentially violent detainees, and (6) permitting the

unconstitutional policies, practices and training of private contractors under the non-delegable duty

doctrine.

In their reply, defendants only address a few of these policies. *See* ECF No. 93. For

efficiency's sake, I too only address a few of these policies.

a. The County's Housing and Placement Policy

Plaintiffs argue that that the county's policy of housing dangerous and mentally unstable

detainees in general population was the moving force behind Mr. Yoemans' death. ECF No. 91 at 41.

They additionally argue that housing vulnerable detainees, like Mr. Yoemans, among dangerous

individuals in general population contributed to Mr. Yoemans' death. *Id*. Defendants argue that "[i]t

would be impossible to house all [mentally unstable] inmates in a mental health unit. Even the current

unit at ACDF does not come close to being able to house all mentally ill inmates."  ECF No. 93 at 5.

While defendants do not explicitly reference plaintiffs' argument about vulnerable detainees being

housed with dangerous individuals, they do state, "[t]he sad truth is that murderers come through the

doors of the Jail quite often and they get housed in maximum security with other dangerous criminals.

Yoemans himself was one of those individuals. . . .  The classification of both Yoemans and Bachicha . .

. was appropriate."  *Id*. at 3.  Accordingly, defendants do not address Mr. Yoemans' recent

hospitalization or whether he had cognitive or physical disabilities.

Plaintiffs argue that the policies for housing individuals was constitutionally deficient because

the classifications unit did not have access to important records, including certain mental health records.

Plaintiffs' expert acknowledges this practice and states that "it is impossible to reasonably ensure safety

unless the jail ensures appropriate personnel have the information needed to make housing decisions."

ECF No. 91-11 at 11.  Additionally, plaintiffs' expert cites to an ACDF policy that allegedly was

systemically not followed.  The policy reads "seriously ill, mentally disordered, injured, non-

ambulatory, sexual predators, protective custody or other special needs inmates . . . are housed in single

occupancy cells or in the medical unit to provide continuous observation and care."  *Id*. at 5.  Despite

this policy, classifications specialists did not consider an inmate's physical health when making

classifications assessments.  As defendant Campbell stated, "physical health has no effect on [an

inmate's] classification level."  ECF 91-2 at 122.

Plaintiffs have presented evidence that raises the question of whether the classifications process

at ACDF was constitutionally adequate given classifications employees (1) being unable to access

mental health records, and (2) not considering an inmate's physical health during the classifications

process despite having a policy requiring single cells for "seriously ill, mentally disordered, [or] *injured*"

individuals.  ECF No. 91-11 at 5 (emphasis added).  Mr. Yoemans, a recently injured individual who

suffered physical disabilities as a result of those injuries, was housed alongside Mr. Bachicha, a non-injured individual who was known to suffer from mental disorders.

Thus, a genuine dispute exists as to whether ACDF systemically violated their own housing and placement policies when they did not take an inmate's physical health into account during the classifications process.  In addition to not taking physical health into account, a genuine dispute exists as to whether classifications officials and medical personnel had access to adequate mental health records when making their classifications and segregation decisions.  Thus, a reasonable jury could find that these policies—and any deviation from them—could have been a moving force behind Mr. Yoemans' death.

### b. The County's Alleged Failure to Train Classifications Officials

Plaintiffs also argue that the county failed to adequately train the classifications unit employees. They argue that this failure to train resulted in Mr. Yoemans and Mr. Bachicha being housed together and ultimately was a moving force behind Mr. Yoemans' death.  Plaintiffs cite to a number of inadequacies in the county's training program for the classifications unit, including: (1) defendant Campbell being given too much control soon after being hired, (2) classifications specialists not being required to alert deputies as to potentially violent inmates, and (3) classifications specialists being trained to *not* fill out the override section of the form.  ECF No. 91 at 43.  Defendants do not address these arguments in their reply.

To succeed on a failure-to-train theory of municipal liability, plaintiffs must show more than mere deficiencies in the county's training program.  Plaintiffs "must identify a specific deficiency in the county's training program closely related to [their] ultimate injury, and must prove that the deficiency in training actually caused [the municipal employee] to act with deliberate indifference to his safety." *Lopez*, 172 F.3d at 756 (quoting *Canton*, 498 U.S. at 391).  I find that plaintiffs have met that burden.

While plaintiffs argue that there were several deficiencies in training classifications specialists, I find one alleged deficiency particularly worthy of mention.  The classifications specialists—those charged with scoring incoming inmates and classifying them according to their scores—were trained to *not* complete the classifications assessment form in its entirety.  The final section on the assessment form asked the classifications specialist to determine whether an override was necessary.  ECF No. 91-5. Put another way, the form asked classifications specialists if they thought classifying inmates based on the scaled score was appropriate, or if they thought overriding the score was necessary.  ECF No. 91-5 at 4.  This part of the form also had a section for classifications specialists to list their reasons as to why an override may be necessary.  *Id.*  Defendant Campbell did not fill out that part of the form for either Mr. Bachicha or Mr. Yoemans.  ECF No. 88-6, 88-9.  When asked about the override section of the form, he stated "[t]his was another part of the form that we were trained to not use back when [Mr. Yoemans] was classified."  ECF No. 91-2 at 123.  He stated, "[i]t was just something on the form . . . that they hadn't used in years."  *Id*. at 65.

Based on the policy as it stood in September 2016, when Mr. Yoemans was classified, and in January 2017, when Mr. Bachicha was classified, a reasonable juror could infer that the county policy was for classifications specialists to not consider whether there was a need to consider other factors aside from the scaled score.  Thus, plaintiffs have identified a specific deficiency in the county's training program that a reasonable jury could determine was a moving force behind the constitutional deprivation.

Based on the above, plaintiffs have alleged sufficient facts and presented sufficient evidence to survive summary judgment as to their claim against the county defendants.  ACDF's possible pattern of violating its own segregation policies coupled with training classifications specialists to not thoroughly

complete the assessment form creates a genuine dispute as to whether municipal policies caused Mr. Yoemans' death.

Defendants motion for summary judgment as to the county defendants is thus DENIED.

**ORDER:**

1.      Defendants' motion for summary judgment as to the Section 1983 claim against defendant Campbell is DENIED.

2.      Defendants' motion for summary judgment as to the Section 1983 claim against defendant McIntosh is DENIED.

3.      Defendants' motion for summary judgment as to the Section 1983 claim against Defendant Reigenborn in his official capacity and the Board of County Commissioners is DENIED.

DATED this 18th day of November 2020.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge